Filed 1/23/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ROSARIO NATIVI et al.,<br><br>  Plaintiffs and Appellants,<br><br>  v.<br><br>DEUTSCHE BANK NATIONAL TRUST COMPANY, et al.,<br><br>  Defendants and Respondents. | H037715<br>(Santa Clara County<br>Super. Ct. No. CV158254) |

In May 2009, the United States Congress enacted the Protecting Tenants Against Foreclosure Act of 2009 (PTFA or Act) (Pub.L. 111-22, Div. A, Title VII, §§ 702-704, May 20, 2009, 123 Stat. 1660) and, in 2010, the Congress amended it (Pub.L. 111-203, Title XIV, § 1484, July 21, 2010, 124 Stat. 2204).[1]  The Act provides protections for bona fide tenants of residential real property at foreclosure following the date of its enactment until its sunset at the end of 2014.  (PTFA, §§ 702, 704.)

Subsequent to a nonjudicial foreclosure sale of residential property in August 2009, tenants Rosario Nativi (Nativi) and her son Jose Roberto Perez Nativi (hereinafter Jose Perez or Perez) were displaced from the property's converted garage unit, which they had been renting for several years.  At the time of the foreclosure sale, appellants' operative lease provided for a one-year term through June 1, 2010.  Deutsche Bank

---

[1]     Unless otherwise specified, all further references to the PTFA or Act are to this cited public law as amended in 2010.

1

National Trust Company as Trustee for American Home Mortgage Assets Trust 2007-5 Mortgage-Backed Pass-Through Certificates, Series 2007-5 (Deutsche Bank or Bank) was the beneficiary under the deed of trust and the purchaser at the foreclosure sale. Appellants sued respondents Deutsche Bank National Trust Company (in its nontrustee capacity), Deutsche Bank (as trustee), and American Home Mortgage Servicing Inc. (AHMSI).

The trial court granted respondents' motion for summary judgment based on its determination that the foreclosure sale extinguished the lease under California law and, therefore, the immediate successor in interest did not step into the shoes of the landlord. The court concluded that the federal PTFA merely required the Bank, as the immediate successor in interest, to give a 90-day notice to vacate the premises to appellants and it imposed no affirmative duty on the Bank to assist such tenants in recovering possession of the leased premises. The court further found that appellants could not establish that the Bank excluded them from the property or put their belongings in the backyard.

Appellants now challenge the trial court's interpretation of the PTFA. They assert that the Act created a landlord-tenant relationship between the Bank and them for the duration of their lease. The appeal raises difficult questions regarding the proper interpretation of the PTFA and the potential liability of an immediate successor in interest in foreclosed residential real property for breach of the implied covenant of quiet enjoyment and wrongful eviction under California law. The parties have not raised any contention regarding the validity of the PTFA or asserted that Congress exceeded its authority in enacting it. An amicus curiae brief was filed on behalf of the National Housing Law Coalition, National Law Center on Homelessness and Poverty, the AARP, the National Fair Housing Alliance, and the California Reinvestment Coalition in support of appellants. The American Legal and Financial Network filed an amicus curiae brief that supports respondents' position.

After careful and extensive consideration, this court concludes, solely as a matter of statutory interpretation, that the PTFA causes a bona fide lease for a term to survive foreclosure through the end of the lease term subject to the limited authority of the immediate successor in interest to terminate the lease, with proper notice, upon sale to a purchaser who intends to occupy the unit as a primary residence. The Act impliedly overrides state laws that provide less protection but expressly allows states to retain the authority to enact greater protections. Bona fide tenancies for a term that continue by operation of the PTFA remain protected by California law.

We conclude that the trial court's analysis was mistaken and respondents were not entitled to summary judgment. Accordingly, the judgment will be reversed.

Appellants also challenge the trial court's order granting respondent AHMSI's motion for a protective order. We find the order was not within the trial court's discretion and reverse.

I

*Procedural History*

On November 25, 2009, appellants Nativi and Perez filed a complaint against Deutsche Bank National Trust Company, its assigns and successors, and Does 1 to 10 for "restitution of premises," compensatory and punitive damages, and injunctive relief. The complaint alleged eight causes of action as follows: (1) wrongful eviction in tort, (2) breach of the covenant of quiet enjoyment, (3) breach of implied covenants of quiet enjoyment–tort, (4) illegal entry of landlord (violation of Civ. Code, § 1954), (5) violation of Civil Code section 1940.2, (6) illegal lockout (violation of Civ. Code, § 789.3), (7) violation of the PTFA, and (8) unfair business practices (Bus. & Prof. Code, § 17200).

On December 31, 2009, Deutsche Bank National Trust Company filed a Notice of Removal that it was removing the action to federal court.

3

The United States District Court, Northern District of California subsequently determined that, by enacting the PTFA, "Congress did not intend to create a private right of action remedy, but rather intended to provide tenants additional rights which could be used in state court proceedings." (*Nativi v. Deutsche Bank Nat. Trust Co.* (N.D. Cal. May 26, 2010, No. 09–06096 PVT) 2010 WL 2179885, 4.) The court dismissed the seventh cause of action (violation of the PTFA) (*id*. at pp. 1, 4-5) and "decline[d] to exercise supplemental jurisdiction over the remaining state law claims" and remanded the matter to the Superior Court of California, County of Santa Clara. (*Id*. at p. 5.)

On July 1, 2010, appellants filed a first amended complaint, which alleged additional causes of action. Deutsche Bank National Trust Company demurred to the first amended complaint on a number of grounds, most of which were overruled. The trial court struck the seventh cause of action (violation of the PTFA) because the federal court had dismissed it before remanding the case.

On December 3, 2010, appellants filed a second amended complaint against Deutsche Bank National Trust Company, Deutsch Bank (as trustee), and AMHSI and Does 3-10. It alleged nine causes of action against the named defendants: (1) wrongful eviction in tort, (2) breach of the covenant of quiet enjoyment, (3) breach of implied covenants of quiet enjoyment–tort, (4) illegal entry of landlord (violation of Civ. Code, § 1954), (5) illegal lockout (violation of Civi.Code, § 789.3), (6) unfair business practices (Bus. & Prof. Code, § 17200), (7) conversion, (8) trespass, and (9) declaratory and injunctive relief (Code Civ. Proc., §§ 526 & 1060). Respondents filed an answer to that complaint.

In April 2011, respondents filed a motion for summary judgment, supporting declarations, and a separate statement of undisputed material facts. They requested judicial notice of the Trustee's Deed Upon Sale, recorded August 12, 2009, in the Santa Clara County Recorder's Office and appellants' second amended complaint.

4

By order filed June 21, 2011, the court accepted the parties' written factual stipulations for the purposes of all further proceedings in the case.

Appellants filed opposition to respondents' motion for summary judgment, a separate statement of undisputed facts, and supporting declarations. They filed written evidentiary objections to the evidence submitted by respondents in support of summary judgment.

By written order filed November 15, 2011, the trial court granted respondents' motion for summary judgment. The trial court concluded that, under California law, the foreclosure sale extinguished the lease and, consequently, Deutsche Bank did not step into the shoes of the former landlord. It also determined that the obligation to give a 90-day notice was the "only burden" imposed on the Bank by the PTFA.

A judgment in favor of respondents and against appellants was filed on November 15, 2011.

By separate written order, also filed on November 15, 2011, the court granted respondent AHMSI's motion for a protective order with respect to certain documents that the court had ordered it to produce.

On December 13, 2011, appellants filed a notice of appeal from the judgment and from the order granting the motion for a protective order.

II

*California Law Background and the Federal PTFA*

A. *Effect of Foreclosure on Preexisting Tenancy Under California Law*

1. *Traditional Property Law*

"Title conveyed by a trustee's deed relates back to the date when the deed of trust was executed. (*Bank of America v. Hirsch Merc. Co.* (1944) 64 Cal.App.2d 175 . . . .) The trustee's deed therefore passes the title held by the trustor at the time of execution. (*Hohn v. Riverside County Flood Control etc. Dist.* (1964) 228 Cal.App.2d 605, 612

5

. . . .)"  (*Dover Mobile Estates v. Fiber Form Products, Inc.* (1990) 220 Cal.App.3d 1494, 1498 (*Dover*).)  "The law is clear that the trustee's deed conveys to the purchaser the trustor's interest as of the date that the deed was recorded.  (*Dover Mobile Estates v. Fiber Form Products, Inc.* (1990) 220 Cal.App.3d 1494, 1498 . . . ; *Sain v. Silvestre* (1978) 78 Cal.App.3d 461, 471 . . . ; *Hohn v. Riverside County Flood Control etc. Dist.* (1964) 228 Cal.App.2d 605, 612-613 . . . .)"  (*Homestead Savings v. Darmiento* (1991) 230 Cal.App.3d 424, 437.)

"A lease is generally deemed to be subordinate to a deed of trust if the lease was created after the deed of trust was recorded.  (*Bank of America v. Hirsch Merc. Co.*, supra, 64 Cal.App.2d at p. 184 . . . ; Miller & Starr, Cal. Real Estate 2d; § 8:82, p. 422.)"  (*Dover*, *supra*, 220 Cal.App.3d at p. 1498.)  "Also, there is no dispute that the general rule is that foreclosure of a senior encumbrance terminates subordinate liens, including leases.  (*Hohn v. Riverside County Flood Control etc. Dist.* (1964) 228 Cal.App.2d 605, 613 . . . .)"  (*Miscione v. Barton Development Co.* (1997) 52 Cal.App.4th 1320, 1326; see *Dover*, *supra*, 220 Cal.App.3d at p. 1498 ["A lease which is subordinate to the deed of trust is extinguished by the foreclosure sale.  [Citations.]"].)  Under traditional California law, "[a] foreclosure proceeding destroys a lease junior to the deed of trust, as well as the lessee's rights and obligations under the lease.  (Nelson & Whitman, Real Estate Finance Law (2d ed. [Lawyer's Ed.] 1985) § 15.11, p. 1114.)"  (*Dover*, *supra*, 220 Cal.App.3d at pp. 1498-1499.)  "Thus, if the sale of the landlord's interest is forced by one having a superior title to that of the tenant, the tenant's interest will be defeated by the sale under the deed of trust.  (*Dover*, *supra*, 220 Cal. App. 3d at p. 1499.)"  (*Aviel v. Ng* (2008) 161 Cal.App.4th 809, 816.)

"When a lease is executed and recorded prior to the recordation of the deed of trust, or if the beneficiary of the deed of trust had notice of a prior unrecorded lease at the time the trust deed was recorded, the lien of the trust deed is junior to the estate of the

6

lessee and his or her right to occupy the premises. The title of the purchaser at a foreclosure sale of the junior lien is subject to the lessee's contract right to occupy the premises." (Miller & Starr, Cal. Real Estate (3d ed. 2009) § 11:101, p. 11-307, fns. omitted; see Civ. Code, §§ 1214 [prior recording of subsequent conveyances], 1215 [defining "conveyance"], 1217 ["An unrecorded instrument is valid as between the parties thereto and those who have notice thereof"]; 3395 ["Whenever an obligation in respect to real property would be specifically enforced against a particular person, it may be in like manner enforced against any other person claiming under him by a title created subsequently to the obligation, except a purchaser or encumbrancer in good faith and for value . . . ."]; *R-Ranch Markets #2, Inc. v. Old Stone Bank* (1993) 16 Cal.App.4th 1323, 1327 [trustee's sale]; *Sumitomo Bank v. Davis* (1992) 4 Cal.App.4th 1306, 1314 [judicial foreclosure sale]; *Dover*, *supra*, 220 Cal.App.3d at p. 1498.)

In the absence of other applicable law providing greater protection to tenants at foreclosure, the purchaser at a foreclosure sale is entitled to recover possession through an unlawful detainer action. (See Code Civ. Proc., § 1161a, subds. (b)(3), (c).)

2. *Enactment and Amendment of Code of Civil Procedure Section 1161b*

Code of Civil Procedure section 1161b (§ 1161b) was enacted in 2008, effective July 8, 2008, in the wake of the foreclosure crisis. (Stats. 2008, ch. 69, §§ 1, 6 & 10, pp. 175-176, 179.) As enacted, it provided: "*Notwithstanding Section 1161a*, a tenant or subtenant in possession of a rental housing unit at the time the property is sold in foreclosure shall be given 60 days' written notice to quit pursuant to Section 1162 before the tenant or subtenant may be removed from the property as prescribed in this chapter." (Stats. 2008, ch. 69, § 6, p. 179 [former § 1161b, subd. (a)], italics added.) The section did not apply, however, "if any party to the note remains in the property as a tenant, subtenant, or occupant." (Stats. 2008, ch. 69, § 6, p. 179 [former § 1161b, subd. (b)].) The enactment of section 1161b was not "intended to affect any local just-cause eviction

7

ordinance." (Stats. 2008, ch. 69, § 7, p. 179.) The Legislature also declared that "[t]his act does not, and shall not be construed to, affect the authority of a public entity that otherwise exists to regulate or monitor the basis for eviction." (*Ibid*.)

Section 1161b was amended in 2012 (Stats. 2012, ch. 562, § 3, p. 4960) and the amendment went into effect on January 1, 2013. (See Cal. Const., art. IV, § 8, subd. (c); Gov. Code, § 9600, subd. (a).) As amended, section 1161b, subdivision (a), provides: "Notwithstanding Section 1161a, a tenant or subtenant in possession of a rental housing unit under a month-to-month lease or periodic tenancy at the time the property is sold in foreclosure shall be given 90 days' written notice to quit pursuant to Section 1162 before the tenant or subtenant may be removed from the property as prescribed in this chapter." As amended, section 1161b, subdivision (b), additionally provides that "tenants or subtenants holding possession of a rental housing unit under a fixed-term residential lease entered into before transfer of title at the foreclosure sale shall have the right to possession until the end of the lease term, and *all rights and obligations under the lease shall survive foreclosure . . . .*" (Italics added.) A fixed-term residential lease is not entitled to this additional protection, however, where "[t]he purchaser or successor in interest will occupy the housing unit as a primary residence," "[t]he lessee is the mortgagor or the child, spouse, or parent of the mortgagor," "[t]he lease was not the result of an arms' length transaction," or "[t]he lease requires the receipt of rent that is substantially less than fair market rent for the property, except when rent is reduced or subsidized due to a federal, state, or local subsidy or law." (§ 1161b, subd. (b).) Section 1161b does "not apply if any party to the note remains in the property as a tenant, subtenant, or occupant." (§ 1161b, subd. (d).)

In enacting the 2012 amendment of section 1161b, the California Legislature was attempting to bring California law in line with the federal PTFA. An Assembly Floor analysis of the bill amending section 1161b explained: "The PTFA, which is currently

8

scheduled to sunset on December 31, 2014, generally requires the purchaser of a home at a foreclosure sale to honor bona fide tenant's lease unless the purchaser intends to occupy the home as their primary residence. If there is no lease, if the lease is terminable at will (a month-to-month tenancy), or if the purchaser will occupy the home as their primary residence, the tenant must be provided with a 90-day notice to vacate (unless a longer period is required by state or local law). As a result, currently federal law generally provides greater protection to tenants than state law by providing additional time (90 vs. 60 days) and imposes a requirement that the lease be honored under certain circumstances. [¶] This bill would make the state law provisions described above comparable to federal law by providing that a new owner of a foreclosed property must honor a tenant's lease." (Assembly Floor, Analysis of Assem. Bill No. 2610 (2011-2012 Reg. Sess.) as amended Aug. 20, 2012, pp. 3-4; see Sen. Rules Com., Office of Senate Floor Analyses, 3d Reading Analysis of Assem. Bill No. 2610 (2011-2012 Reg. Sess.) as amended Aug. 20, 2012, pp. 2, 4-5.)

B  *Federal Protecting Tenants at Foreclosure Act of 2009*

1.  *Provisions of the PTFA*

The PTFA was enacted as part of the "Helping Families Save Their Homes Act of 2009" enacted in 2009. (Pub.L. 111-22, Div. A, Title VII, May 20, 2009, 123 Stat. 1660.) The PTFA is a very short act, consisting of only four sections. Section 701 of the PTFA establishes its short title.

Section 702 of the PTFA specifies the protections for bona fide tenants of foreclosed properties. Section 702, subdivision (a), of the PTFA provides: "IN GENERAL.--In the case of any foreclosure on a federally-related mortgage loan or on any dwelling or residential real property after the date of enactment of this title [May 20, 2009], any immediate successor in interest in such property pursuant to the foreclosure shall assume such interest subject to -- [¶] (1) the provision, by such successor in interest

9

of a notice to vacate to any bona fide tenant at least 90 days before the effective date of such notice; and [¶] (2) the rights of any bona fide tenant—[¶] (A) under any bona fide lease entered into before the notice of foreclosure to occupy the premises until the end of the remaining term of the lease, except that a successor in interest may terminate a lease effective on the date of sale of the unit to a purchaser who will occupy the unit as a primary residence, subject to the receipt by the tenant of the 90 day notice under paragraph (1); or [¶] (B) without a lease or with a lease terminable at will under state law, subject to the receipt by the tenant of the 90 day notice under subsection (1), [¶] except that nothing under this section shall affect the requirements for termination of any Federal- or State-subsidized tenancy or of any State or local law that provides longer time periods or other additional protections for tenants."

Section 702, subdivision (b), of the PTFA, provides that for purposes of this section "a lease or tenancy shall be considered bona fide only if—[¶] (1) the mortgagor or the child, spouse, or parent of the mortgagor under the contract is not the tenant; [¶] (2) the lease or tenancy was the result of an arms-length transaction; and [¶] (3) the lease or tenancy requires the receipt of rent that is not substantially less than fair market rent for the property or the unit's rent is reduced or subsidized due to a Federal, State, or local subsidy."

Section 702, subdivision (c), of the PTFA, states that as used by this section "the term 'federally-related mortgage loan' has the same meaning as in section 3 of the Real Estate Settlement Procedures Act of 1974 (12 U.S.C. 2602)." As amended in 2010, section 702, subdivision (c), also provides: "For purposes of this section, the date of a notice of foreclosure shall be deemed to be the date on which complete title to a property is transferred to a successor entity or person as the result of an order of a court or pursuant to provisions in a mortgage, deed of trust, or security deed." (Pub.L. 111-203, Title XIV, § 1484, July 21, 2010, 124 Stat. 2204.)

10

Section 703, subdivision (2), of the PTFA inserted new language at the end of (o)(7)(F) of United States Code, title 42, section 1437f, which concerns low income housing assistance: "In the case of any foreclosure on any federally-related mortgage loan (as that term is defined in section 2602 of Title 12) or on any residential real property in which a recipient of assistance under this subsection resides, the immediate successor in interest in such property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the housing assistance payments contract between the prior owner and the public housing agency for the occupied unit, except that this provision and the provisions related to foreclosure in subparagraph (C) shall not affect any State or local law that provides longer time periods or other additional protections for tenants."  (Italics added.)

Under section 704 of the PTFA, a sunset provision, the Act is repealed and its requirements terminate on December 31, 2014.

2.  "*Shall Assume Such Interest Subject to*"

Appellants assert that the federal statute "created a landlord-tenant relationship for the remaining period of [their] lease, i.e. through June 1, 2010." They argue that the Bank owed at least the same duties to them as any California landlord owes to its tenant.

Respondents maintain that "the PTFA only provides a defense to eviction proceedings in state court."  They state that "tenants can contest eviction proceedings (i.e., defend an unlawful detainer action) on the grounds that the post-foreclosure owner has not complied" with the PTFA's requirement to provide notice or permit continued occupancy.  They contend there is not a single case in which the PTFA has been asserted as a basis for a tenant's claims against a "post-foreclosure owner."  They also suggest that the Act "*at most* provides only that a bona fide tenant has the right to occupy the premises until the end of the remaining term of the lease" and did not make Deutsche Bank the landlord.

11

"Our goal is to determine the Legislature's intent and adopt a construction that best effectuates the purpose of the law. (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 888 . . . ; *In re J.W.* (2002) 29 Cal.4th 200, 209 . . . .)  We begin with the statutory language because it generally provides the most reliable indication of legislative intent. (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 625 . . . ; *People v. Gardeley* (1996) 14 Cal.4th 605, 621 . . . .)  ' "If the statutory language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls. [Citation.]"  [Citation.]  We consider extrinsic aids, such as legislative history, only if the statutory language is reasonably subject to multiple interpretations.' (*Miklosy v. Regents of University of California*, at p. 888 . . . .)"  (*In re W.B., Jr.* (2012) 55 Cal.4th 30, 52.)

In determining whether section 702 of the PTFA causes a bona fide lease to survive foreclosure despite contrary state law, we begin taking particular note of its phrases "any immediate successor in interest in such property pursuant to the foreclosure *shall assume such interest subject to . . .*" and "except that a successor in interest *may terminate a lease . . . .*"  (Italics added.)  We also observe that, despite respondents' assertions, the Act does not expressly state that the PTFA's protections may be invoked only as an affirmative defense.  The language of section 702 of the Act seems to indicate that a successor in interest takes title in the foreclosed property subject to a bona fide lease for a term because otherwise it would be nonsensical to provide that an immediate successor has the power to "terminate a lease" as specified.

On the other hand, Congress could have been more straightforward.  As indicated, section 703, subdivision (2), of the PTFA, which amended existing law to state the effect of foreclosure on housing assistance, contained more direct language: "the immediate successor in interest in such property pursuant to the foreclosure *shall assume such interest subject to the lease* between the prior owner and the tenant and to the housing

12

assistance payments contract . . . ." (42 U.S.C. § 1437f, subd. (o)(7)(F), italics added.) Congress could have also said, as did the California Legislature, that "all rights and obligations under the lease shall survive foreclosure" (§ 1161b, subd. (b)).

"To the extent a statutory text is susceptible of more than one reasonable interpretation, we will consider ' "a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' [Citation.]" (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 929, fn. omitted.) Accordingly, we turn to extrinsic aids to determine whether or not Congress intended bona fide leases for a term to survive foreclosure and bind successors in interest.

3. *Legislative History*

On May 1, 2009, Senator John Kerry submitted an amendment (SA 1036) to add the PTFA, as proposed, to another amendment (SA 1018) to a bill (S. 896), which was aimed at preventing mortgage foreclosures and enhancing mortgage credit. (155 Cong. Rec. S5029 (May 1, 2009).)

On May 5, 2009, Senator Kerry called up the amendment for consideration. (155 Cong. Rec. S5110 (May 5, 2009.) The senator stated that he was "offering this amendment to address the needs of renters in properties that have been foreclosed." (*Ibid*.) He argued: "Congress has already taken extraordinary measures to help troubled borrowers in communities where they have abandoned foreclosed properties, but Congress has done very little to help renters who have been paying their rent regularly on time but, unfortunately, they have landlords who are losing their property to foreclosure. So these renters are absolutely blameless victims in the foreclosure catastrophe that has hit the country. . . . [¶] These renters often have absolutely no idea that their home is about to be foreclosed. Depending on the State they live in, they may be evicted with absolutely no notice. Obviously, this could be particularly difficult for low-income

13

renters who don't have the resources to relocate or even to do so very quickly. [¶] Under this amendment, tenants in any federally related mortgage loan or any dwelling or residential real property with a lease have a right to remain in the unit until the end of the existing lease. If a new purchaser intends to use the property as a primary residence, then the lease may be terminated, but the tenant has to receive 90 days' notice to vacate. [¶] So what we believe is that this provides an appropriate level of protection. It doesn't take away the right of someone who takes over the home in foreclosure to be able to then transition that property or it decides if that person is going to keep the property as a rental property, the person who already has a legitimate lease has a right to be able to stay." (155 Cong. Rec. S5110-5111 (May 5, 2009).) Senator Kerry declared that "[a] landlord should not be allowed to come in, change the locks, and force out tenants who were there completely legitimately, with an expectation that they were coming home to their same old home." (155 Cong. Rec. S5111 (May 5, 2009).) He explained: "Furthermore, [it] states specifically that none of the provisions here would affect any State and local law that provides a longer time period or other additional protections to renters. So there is nothing here that reduces the protection renters get." (*Ibid*.)

Senator Kerry gave examples of tenants returning home to find locks changed, utilities turned off, or possessions put out on the street. (*Ibid*.) He stated: "It is well documented how foreclosure is already overpowering countless numbers of homeowners who are unable to pay their mortgages, but foreclosure is also causing a rampage of sudden evictions of renters. My amendment would stop that rampage and help unsuspecting renters from falling victim to foreclosure in which they played absolutely no part." (*Ibid*.)

Senator Dodd offered his comments on the amendment. Among other things, he stated that "the measure requires at least 90-days' notice for all renters in federally related housing, but would honor the full term of any existing lease unless a new owner will

14

occupy the home."  (155 Cong. Rec. S5115 (May 5, 2009).)  He explained:  "What Senator Kerry is saying here, at least for tenants who are in good standing on their properties, they should not be affected because the property ended up in foreclosure through whatever rationale that may have happened to the landlord.  It seems to me, putting people out on the street is not what we ought to be doing at a time such as this."  (*Ibid.*)

On May 6, 2009, during further debate, Senator Kerry argued:  "[W]e have taken a lot of effort to try to help troubled borrowers in communities that have foreclosed properties.  Here is the problem that exists.  If you are a renter and living in a property that has been foreclosed on, you have nothing to do with the foreclosure, you are paying rent, you have a lease, but a lot of these people are getting kicked out of their apartments, out of their homes.  [¶]  What we want to do is provide them with a provision where they will have 90 days--if the people who foreclosed are going to use that residence as a primary residence.  If the residence is going to continue to be a multiple-party residence where they have a number of people renting and they will continue to use it as such, we want to leave those leases in effect until the end of the lease.  We are protecting legitimate, low- to moderate-income folks in America who do not get protections otherwise from being just booted out on the street, which is literally what has happened in the absence of this protection."  (155 Cong. Rec. S5174 (May 6, 2009).)

The legislative history of the enactment of PTFA strengthens the case that its section 702 was intended to cause bona fide leases for a term to survive foreclosure.[2]

---

[2]      After the enactment of U.S. Public Law 111-22 (S 896), which included the PTFA, both Senators Kerry and Dodd reiterated, on the congressional record, their prior descriptions of the effect of the Act.  On the record, Senator Dodd stated with respect to the recently enacted PTFA: "This new law protects tenants facing evictions due to foreclosure by ensuring they can remain in their homes for the length of the lease or, at the least, receive sufficient notice and time to relocate their families and lives to a new home.  The full Senate approved the bill on May 6, 2009, and President Obama signed it

4. *Administrative Construction*

We also take a look at administrative construction of the PTFA as an aid to judicial interpretation. "Although we are not bound by administrative decisions construing a controlling statute, we accord ' "great weight and respect to the administrative construction." ' [Citation.] The amount of deference given to the administrative construction depends ' "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." ' [Citation.]" (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 524, italics omitted.) "When an administrative agency construes a statute in adopting a regulation or

---

into law on May 20, 2009. [¶] These protections are so important that my colleague Senator Kerry and I want to ensure that families and mortgage holders know their rights and obligations under the law. [¶] Under the new law, all bona fide tenants who began renting prior to transfer of title by foreclosure of their rental property must be given at least 90 days' notice before being required to vacate the property. In addition, these bona fide tenants are allowed to remain in place for the remainder of any leases entered into prior to the transfer of title by foreclosure. These leases may be terminated earlier only if the property is transferred to someone who intends to reside in the property and only if the tenants are given at least 90 days' notice of the fact of such sale. Successors in interest to properties with section 8 housing choice voucher tenants automatically assume the obligations of the former owner under the housing assistance payments contract. [¶] These basic protections are the law for tenants in every State, unless States have laws or practices that provide greater protections." (155 Cong. Rec. S8978 (August 6, 2009).) Senator Kerry concurred: "I also agree with Chairman Dodd's statement of the intent of the legislation. As the chairman stated, the law was intended to provide all bona fide tenants, who began renting prior to transfer of title by foreclosure of their rental property, be given at least 90 days' notice before being required to vacate the property. In addition, these bona fide tenants are allowed to remain in place for the remainder of any leases entered into prior to the transfer of title by foreclosure. These leases may be terminated earlier only if the property is transferred to someone who intends to reside in the property and only if the tenants are given at least 90 days' notice of the fact of such sale. Successors in interest to properties with section 8 housing choice voucher tenants automatically assume the obligations of the former owner under the Housing Assistance Payments contract." (*Ibid.*)

16

formulating a policy, the court will respect the agency interpretation as one of several interpretive tools that may be helpful." (*Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 322.)

Shortly after the PTFA was enacted, the Department of Housing and Urban Development (HUD) issued a notice, entitled "Protecting Tenants at Foreclosure: Notice of Responsibilities Placed on Immediate Successors in Interest Pursuant to Foreclosure of Residential Property," dated June 24, 2009. (74 Fed.Reg. 30106-30108 (June 24, 2009).) HUD indicated that it was "directing this notice to entities and individuals that participate in HUD programs or with whom HUD interacts in its HUD programs" but that "these obligations are not limited to FHA-insured or HUD-assisted housing." (74 Fed.Reg. 30106 (June 24, 2009).) The notice announced: "[The PTFA] . . . requires that tenants residing in foreclosed residential properties be provided notice to vacate at least 90 days in advance of the date by which the immediate successor, generally, the purchaser, seeks to have the tenants vacate the property. Except where the purchaser will occupy the property as the primary residence, the term of any bona fide lease also remains in effect." (*Ibid.*) It specified: "Section 702 [of the PTFA] provides a tenant under any bona fide lease entered into before the notice of foreclosure has the right to occupy the premises until the end of the remaining term of the lease. The only exception to preserving the remaining term of the lease is for a purchaser who will occupy the unit as a primary residence. Even under this exception, however, the tenant must still be provided with the 90-day advance notice to vacate." (74 Fed.Reg. 30107 (June 24, 2009).)

That June 2009 HUD notice further explained that "Section 703 [of the PTFA] makes conforming changes consistent with the Section 702 requirements to the Section 8 rental voucher assistance of the United States House Act of 1937 (1937 Act)" (74 Fed.Reg. 30106 (June 24, 2009).) The notice stated: "Section 8(o)(7) of the 1937 Act is further amended by Section 703 to provide that the successor in interest in the case of any

17

foreclosure of a property in which a voucher recipient resides assumes the interest in the property subject to the lease and HAP [housing assistance payment] contract in place before the foreclosure.  This provision confirms that the section 8 tenant's lease is, in effect a bona fide lease and that the HAP contract survives the foreclosure, just as the lease does."  (74 Fed.Reg. 30107-30108 (June 24, 2009).)

In a September 28, 2009 letter to "FDIC-Supervised Institutions," the Federal Deposit Insurance Corporation (FDIC) explained that, under the PTFA, "[a]ll tenants must receive a 90-day notice before being evicted as the result of a foreclosure."[3]  (FDIC Financial Institutions Letter, FIL-56-2009, Sept. 28, 2009 <http://www.fdic.gov/news/news/financial/2009/fil09056.html> [as of Aug. 23, 2013].)  The letter stated: "With some exceptions, the law requires that in the event of foreclosure, existing leases for renters are honored to the end of the term of their lease." (*Ibid*.)  It further said: "The stated exceptions are for tenants without a lease, tenants with a lease terminable at will under state law, or where the owner acquiring the property will occupy it as a primary residence.  In these cases, the tenants must receive a minimum of 90 days notice to vacate the property."  (*Ibid*.)  It advised that "FDIC examiners will monitor and enforce compliance with the requirements of this law in the same manner as other consumer protection laws and regulations."  (*Ibid*.)

By notice dated October 28, 2010, HUD provided additional guidance on the PTFA.  (75 Fed.Reg. 66385-66386 (October 28, 2010).)  The notice addressed "the interplay of the PTFA notice requirements with the notice requirements of [the Federal

---

[3]     Appellants asked this court to take judicial notice of the FDIC's September 28, 2009 letter.  We granted appellants' request.  (Evid. Code, §§ 452, subd. (c), 459; see *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 776, fn. 5 [Supreme Court considered CalTrans manual as background to its determination of the law and granted request for judicial notice of it even though the request was unnecessary]; see also (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 46, fn. 9 ["A request for judicial notice of published material is unnecessary"].)

Housing Administration's] occupied conveyance regulations." (75 Fed.Reg. 66386 (October 28, 2010).) It reiterated HUD's understanding of the PTFA. (75 Fed.Reg. 66385-66386 (October 28, 2010).) It explained that "the date of notice of foreclosure" had been defined by additional legislation. (75 Fed.Reg. 66386 (October 28, 2010).) It stated: "To fall under the Act, a bona fide lease must be entered into prior to the date of the notice of foreclosure, which is defined as 'the date on which complete title to a property is transferred to a successor entity or person as a result of an order of a court or pursuant to the provisions in a mortgage, deed of trust, or security deed.' " (*Ibid*.)

In March 2012, HUD issued a notice providing "further guidance on the relationship between FHA [Federal Housing Administration] regulations and protections for existing tenants under the PTFA." (77 Fed.Reg. 15379-15382 (March 15, 2012).) HUD again described the PTFA's protections of tenants, including the 90-day notice requirement and preservation of the term of bona fide leases. (*Ibid*.) It indicated that the "requirements of the PTFA apply with respect to properties secured by FHA-insured mortgages as well as those in the Section 8 program." (77 Fed.Reg. 15379 (March 15, 2012).) As to mortgagee compliance under the PTFA, the notice stated: "Before completion of foreclosure, the mortgagee must confirm the identity of all occupants, determine each occupant's possible rights for continued occupancy under the PTFA and state or local law, and attempt to obtain documentation of existing leases and tenancies." (77 Fed.Reg. 15380 (March 15, 2012).)

The U.S. Office of the Comptroller of the Currency (OCC) issued a bulletin, dated December 14, 2011, to "Chief Executive Officers of All National Banks and Federal Savings Associations, Department and Division Heads, and All Examining Personnel" regarding "Guidance on Potential Issues With Foreclosed Residential Properties." (OCC Bulletin, OCC 2011-49, Dec. 14, 2011 <http://www.occ.gov/news-issuances/bulletins/2011/bulletin-2011-49.html> [as of Aug. 22, 2013].) In discussing

19

the obligations of the national banks and federal savings associations (collectively, banks) as the owner of a foreclosed property, the OCC's bulletin warned that "[i]n acquiring title to foreclosed properties, banks assume the primary responsibilities of an owner, including . . . serving as a landlord for rental properties." (*Ibid*.) The bulletin stated: "The Protecting Tenants at Foreclosure Act of 2009 provides tenants with protections from eviction as a result of foreclosure on the properties they are renting." (*Ibid*.) It advised: "When a bank takes title to a house after foreclosure, it must honor any exiting rental agreement with a bona fide tenant and must provide 90 days' notice to the tenant prior to eviction whether or not the tenant has a rental agreement." (*Ibid*.)

In early 2013, the FDIC provided guidance to assuming institutions regarding the "cash for keys" program. (FDIC, RSAM Guidance 2013-G001, Jan. 7, 2013 <http://www.fdic.gov/bank/individual/failed/lossshare/RSAM_Guidance-2013-G001_Cash_For_Keys.pdf> [as of Aug. 23, 2013].) It counseled that bona fide leases are protected under the PTFA: "For tenants under a lease who are current on their rental obligations, PTFA prohibits an eviction prior to the end of their lease terms -- the lease survives foreclosure. The new owner must fulfill the landlords['] responsibilities under the lease, but he is under no legal obligation to renew or extend the lease. There is an exception to the lease protection: if the new owner intends to occupy the rental property as his primary residence, the new owner can break the lease, but the tenant must be given 90 days from the eviction notice date to vacate the property."

5. *Construction of the PTFA*

No one disputes that the PTFA mandates that, at a minimum, an immediate successor in interest in foreclosed property give 90-days notice to vacate to bona fide tenants of residential property. In light of the legislative history of the PTFA and the Act's consistent administrative construction, it also appears unmistakable that Congress intended a bona fide lease to survive foreclosure through the end of the lease term by

20

operation of the Act.  Congress struck a compromise by preserving bona fide leases for the duration of their remaining terms while providing immediate successors in interest the authority to "terminate a lease" "effective on the date of sale of the unit to a purchaser who will occupy the unit as a primary residence" with the provision of at least 90-days notice to vacate.  (PTFA, § 702, subd. (a)(2).)

If section 702 of the PTFA were read as only requiring a 90-day notice to vacate, much of its statutory language would be mere surplusage.  Similarly, if that section were read as applying only to leases that already survive foreclosure under state law, then the Act's special protection for bona fide tenancies for a term would be rendered completely superfluous.  "The rules of statutory construction direct us to avoid, if possible, interpretations that render a part of a statute surplusage.  [Citations.]"  (*People v. Cole* (2006) 38 Cal.4th 964, 980-981.)  Courts "must strive to give meaning to every word in a statute and to avoid constructions that render words, phrases, or clauses superfluous. [Citations.]"  (*Klein v. U.S.* (2006) 50 Cal.4th 68, 80.)  The well-established principles of statutory construction "preclude judicial construction that renders part of the statute 'meaningless or inoperative.'  [Citation.]"  (*Hassan v. Mercy American River Hosp.* (2003) 31 Cal.4th 709, 715-716.)

Although respondents insist that the PTFA provides nothing more than an affirmative defense to judicial proceedings to oust a tenant from a foreclosed property, we find no language in the Act suggesting such limitation.  Moreover, their position appears untenable when examined in the light of the PTFA's legislative history, the "evils to be remedied," and administrative construction of the Act by federal entities.  "The object that a statute seeks to achieve is of primary importance in statutory interpretation. [Citations.]"  (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 987.)  Congress clearly intended the Act to put a stop to self-help measures like blocking bona fide tenants' access, turning off their utilities, or removing the tenants' possessions.  If this

21

court accepted the view that the PTFA could be invoked only defensively in court, bona fide tenancies for a term surviving foreclosure only by operation of the Act would be largely unprotected and immediate successors in interest could interfere with tenants' possessory rights with impunity so long as they did not commence eviction proceedings or other legal action in which the Act could be raised as a defense. That result would be completely at odds with the aim of the Act.

Similarly, a conclusion that Congress was merely bestowing the isolated right to occupy the leased premises through end of bona fide tenancies for a term would be inconsistent with the statutory language suggesting that bona fide leases for a term continue in effect ("a successor in interest may terminate a lease") and the protective purposes of the PTFA. Such an interpretation would lead to the absurd result that a bona fide tenant could "occupy" leased premises for the duration of a lease term with no obligation to pay rent as provided by the lease to a successor in interest and a successor in interest in a foreclosed property would *not* be obligated, by the lease's implied warranty of habitability, "to maintain leased dwellings in a habitable condition throughout the term of the lease. [Citation.]" (*Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1204.)

The interpretation of section 702 of the PTFA that most reasonably comports with Congressional intent is that a subordinate bona fide lease survives foreclosure for the remainder of the term by operation of the Act regardless of the state law to the contrary and, consequently, the bona fide tenants under that lease and the immediate successor in interest in the foreclosed property have a landlord-tenant relationship, although the lease may be terminated as provided in the Act. (Cf. *Gross v. Superior Court* (1985) 171 Cal.App.3d 265, 274 [purchaser of property, which was subject to local rent stabilization ordinance, at nonjudicial foreclosure sale "became a 'landlord' by operation of law" even though written lease agreement executed subsequent to the recordation of the deed of trust].)

22

6. *Preemption*

Appellants' amici curiae assert that tenants' rights under section 702 of the PTFA preempt less protective state law. The United States Supreme Court has recognized that the supremacy clause of Article VI of the U.S. Constitution "may entail pre-emption of state law either by express provision, by implication, or by a conflict between federal and state law. [Citations.]" (*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (1995) 514 U.S. 645, 654 [115 S.Ct. 1671].) "[Preemption] principles are not inapplicable . . . simply because real property law is a matter of special concern to the States: 'The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail.' [Citations.]" (*Fidelity Federal Sav. and Loan Ass'n v. de la Cuesta* (1982) 458 U.S. 141, 153 [102 S.Ct. 3014].) The only reasonable conclusion with respect to the PTFA is that the Congress intended to supplant less protective state law but not "any State or local law that provides longer time periods or additional protections for tenants." (PTFA, § 702, subd. (a).) Accordingly, assuming the validity of the PTFA, the Act prevails over state law that would otherwise extinguish a bona fide lease within the meaning of the Act and the immediate successor in interest in foreclosed property takes subject to a bona fide tenancy for a term but it retains the power to terminate the lease as provided by the Act.

7. *No Federal Private Right of Action*

Appellants do not dispute that the PTFA did not create a private cause of action under federal law. (See e.g. *Nativi v. Deutsche Bank Nat. Trust Co.*, *supra*, 2010 WL 2179885, 4; see also *Logan v. U.S. Bank Nat. Ass'n* (9th Cir. 2013) 2013 WL 3614465, 1 [PTFA does not create a private right of action].) The lack of federal private cause of action under the PTFA, however, does not determine state law claims in state courts.

23

Some federal courts have determined that Congress intended tenant rights established by the PTFA to be enforceable under state law. (See e.g. *Ingo v. Deutsche Bank Nat. Trust Co.* (D. Utah Nov. 29, 2011) 2011 WL 5983340, 3 ["PTFA was intended to allow tenants who are victims of the foreclosure crisis a protection that can be used in the state courts to combat unlawful evictions"]; *Nativi v. Deutsche Bank Nat. Trust Co.*, *supra*, 2010 WL 2179885, 4 [Congress "intended to provide tenants additional rights which could be used in state court proceedings"]; see also *Logan v. U.S. Bank Nat. Ass'n, supra,* 2013 WL 3614465, 8 ["PTFA's nationwide federal policy and requirements are not rendered unenforceable by the absence of a federal private right of action. [Citation.]"].) For example, in *Webb v. Green Tree Servicing, LLC* (D. Md. June 07, 2012) 2012 WL 2065539, the court found it unnecessary to resolve whether the PTFA supports a private right of action because the plaintiff asserted a negligence claim. (*Id*. at p. 7, fn. 8.) It noted that "[t]he existence of an express or implied private right of action is not necessary to a negligence claim based on a statutory violation."[4] (*Ibid*.)

8. *Illegality of Converted Garage Unit Does Not Make PTFA Inapplicable*

Respondents argue that appellant's lease was void as a matter of law because the garage unit was illegal and, therefore, the PTFA did not apply. Respondents did not rely upon evidence of the illegality of the garage unit in moving for summary judgment. Moreover, we see nothing in the language or legislative history of the PTFA exempting

---

[4]     We observe that in California, Evidence Code section 669 "codifies the common law doctrine of negligence per se, pursuant to which statutes and regulations may be used to establish duties and standards of care in negligence actions." (*Elsner v. Uveges, supra,* 34 Cal.4th at p. 927, fn. omitted.) "Statutes may be borrowed in the negligence context for one of two purposes: (1) to establish a duty of care, or (2) to establish a standard of care. [Citations.]" (*Id*. at p. 928, fn. 8; see *Toole v. Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 702-704 [rebuttable presumption of negligence arose from violation of Federal Food, Drug, and Cosmetic Act].) Appellants' complaint, however, did not allege a negligence cause of action.

leases involving illegal rental units. The essential goal of the federal law is to protect vulnerable tenants at foreclosure. Its protective purpose to prevent abrupt dispossession of tenants as a result of foreclosure would be frustrated if we accepted respondents' argument that the PTFA does not apply to illegal rental units.

In *Carter v. Cohen* (2010) 188 Cal.App.4th 1038 (*Carter*), a former tenant sued her former landlord for damages for rent overpayments. (*Id*. at p. 1042.) She had leased a detached guesthouse, which had been constructed without permits, located on a residential property that also contained a house. (*Ibid*.) She claimed that the rent increases, imposed by her former landlord after he bought the residential property, exceeded the limits set by a municipal rent stabilization ordinance (RSO). (*Ibid*.) The issue on appeal was whether former tenant was entitled to recover her excess rent payments even though the guest house lacked a certificate of occupancy and was not registered under the ordinance. (*Id*. at p. 1046.) The former landlord contended that the action to recover excess rent payments failed as a matter of law because the rental agreement was unlawful and outside the scope of the ordinance. (*Id*. at p. 1043.) He maintained that the rental agreement was "void and unenforceable because the guesthouse had been built without permits, lacked a certificate of occupancy, and was unregistered under the RSO." (*Id*. at p. 1047.)

The appellate court acknowledged that "[r]ental agreements that were constructed without building permits or lack a certificate of occupancy are ordinarily regarded as unlawful and void. [Citations.]" (188 Cal.App.4th at p. 1047.) "Generally, 'the courts . . . will not enforce an illegal bargain or lend their assistance to a party who seeks compensation for an illegal act.' (*Lewis & Queen v. N.M. Ball Sons* (1957) 48 Cal.2d 141, 150-151 . . . (*Lewis & Queen*).)" (*Ibid*.) But the appellate court refused to apply the rule in that case because otherwise public policy would be thwarted. (*Id*. at pp. 1048-1050.)

25

The appellate court in *Cohen* stated that "the rule barring the enforcement of unlawful contracts is not absolute." (*Id*. at p. 1048.) "An exception to that rule exists " '[w]hen the Legislature enacts a statute forbidding certain conduct for the purpose of protecting one class of persons from the activities of another, a member of the protected class may maintain an action notwithstanding the fact that he has shared in the illegal transaction. The protective purpose of the legislation is realized by allowing the plaintiff to maintain his action against a defendant within the class primarily to be deterred. In this situation it is said that the plaintiff is not in pari delicto. [Citations.]' ([*Lewis & Queen v. N.M. Ball Sons* (1957) 48 Cal.2d] at p. 153 . . . , italics omitted.)" (*Ibid*.) When this exception applies, "a plaintiff's awareness that he or she may be participating in improper conduct does not bar relief under a statute if raising such a barrier would defeat the aim of the statute." (*Id*. at p. 1050.) It noted that "[c]ourts have thus permitted parties to obtain benefits under a law enacted for their protection, despite their participation in transactions that contravened the law [citation]." (*Id*. at p. 1048.) The appellate court concluded that "[b]ecause '[t]he protective purpose of the legislation [was] realized by allowing [Carter] to maintain [her] action against [her landlord]' (*Lewis & Queen*, *supra*, 48 Cal.2d at p. 153), the trial court properly permitted her to assert her RSO claim." (*Id*. at p. 1049.)

Similarly in this case, permitting Deutsche Bank, the immediate successor in interest in the foreclosed property, to invoke the general rule that illegal contracts are unenforceable would allow it to circumvent the PTFA and frustrate its fundamental public policy purpose. At this juncture, we need not resolve whether an immediate successor in interest could lawfully terminate a bona fide tenancy for a term if a municipality brought an enforcement action for code violations or whether the PTFA would require the successor in interest to bring the property into compliance to avoid liability.

26

# III

## *Summary Judgment*

### A. *Standard of Review*

A reviewing court "owe[s] the superior court no deference in reviewing its ruling on a motion for summary judgment; the standard of review is de novo. [Citation.]" (*Coral Const., Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336.) Thus, "[w]e review the trial court's decision de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 . . . .)" (*State v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017-1018.)

"First, and generally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . A defendant bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. (*Id*., § 437c, subd. (o)(2) [now (p)(2)].)" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. [Citation.]" (*Ibid*., fn. omitted.)

"Second, and generally, the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid*.) "Third, and generally, how the parties moving for, and opposing, summary judgment may each carry

27

their burden of persuasion and/or production depends on *which* would bear *what* burden of proof at trial." (*Id*. at p. 851.) Thus, where a plaintiff would bear the burden of proof by a preponderance of evidence at trial, a defendant moving for summary judgment "must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not-otherwise, *he* would not be entitled to judgment *as a matter of law*, but would have to present *his* evidence to a trier of fact." (*Ibid*., fn. omitted.)

"[E]ven though the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact, it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact*." (*Id*. at p. 856.) In ruling on the motion, the court must view the evidence and inferences in the light most favorable to the opposing party. (*Id*. at p. 843.)

A motion for summary judgment must be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, except that to which objections have been made and sustained by the court, and all inferences reasonably deducible from the evidence, except summary judgment may not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact." (*Ibid*.)

B. *State Law Claims*

As discussed, we conclude that the trial court erred in its interpretation of the PTFA. Respondents have not identified any legal bar precluding a bona fide tenant whose bona fide tenancy for a term survives foreclosure by operation of the PTFA from seeking state law remedies for violations of the tenant's rights against an immediate

28

successor in interest in a foreclosed property.  Appellants assert that the trial court should not have granted summary judgment in favor of respondents because triable issues of material fact exist with regard to their causes of action for breach of the covenant of quiet enjoyment and wrongful eviction.

1. *Pleadings*

The pleadings " 'set the boundaries of the issues to be resolved at summary judgment.'  (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 648 . . .; see generally *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 . . . ['pleadings serve as the outer measure of materiality in a summary judgment proceeding'].) [Citations.]"  (*Conroy v. Regents of University of Cal.* (2009) 45 Cal.4th 1244, 1250 (*Conroy*).)  When an appellate court reviews a ruling on a motion for summary judgment, it must identify the issues framed by the pleadings.  (See *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252.)  "The materiality of a disputed fact is measured by the pleadings [citations] . . . ."  (*Conroy v. Regents of University of Cal.*, *supra*, 45 Cal.4th at p. 1250; *id*. at p. 1254.)  Moving defendants have "the burden on summary judgment of negating only those ' "theories of liability *as alleged in the complaint*" ' and [are] not obliged to ' " ' "refute liability on some theoretical possibility not included in the pleadings," ' " ' simply because such a claim was raised in plaintiff's declaration in opposition to the motion for summary judgment.  (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 332 . . . .)"  (*Id*. at p. 1254.) Declarations in opposition to a motion for summary judgment are not a substitute for amending the pleadings to raise additional theories of liability.  (*Ibid*.)  "[S]ummary judgment cannot be *denied* on a ground not raised by the pleadings.  [Citations.]" (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1663.)

In their second amended complaint, appellants generally alleged the following. Appellants became tenants of a two-bedroom unit located at 1156 Stoneylake Court

29

beginning on June 1, 2007. They leased by the year from the former owner, Daisy Cazzali (Cazzali) and the most recent lease commenced on June 1, 2009. Deutsche Bank "purported to foreclose" on the property and, as trustee, took title to it. After it acquired title, the bank contracted with AMHSI to service the property and AMHSI hired a local real estate company, XL Advisors Inc. dba Advisors Real Estate Group (Advisors), to prepare the property for sale and oust its occupants. Advisors was operated by real estate agent Rob Roham and it employed Paulette Diaz. Appellants did not receive any notice from respondents acknowledging their rights as tenants under the PTFA.

Appellants further generally averred the following. All of their "belongings were removed from their home and thrown into the backyard, where the belongings were destroyed." Respondents deprived them of possession of their home by unlawfully evicting them and refusing to allow them to return to the premises. When appellants tried to access their home they were removed from the property by the police at respondents' instruction. Appellant Perez returned from a trip at the end of September 2009 to find all of his and his mother's belongings thrown out into the yard. The police were called to the property and Diaz, acting on behalf of respondents, instructed police to exclude appellant Perez from the property. When Perez called Diaz the following day and asked to be restored to possession, Diaz did nothing to assist him. When appellant Nativi tried to return to the property after returning from a trip at the end of October, Diaz instructed that Nativi be excluded from the property. On November 2, 2009, appellant Nativi's "representative" contacted Diaz and asked for appellants to be restored to the premises. Respondents never acknowledged their lease as required by the PTFA and they refused to "uphold [appellants'] right to possession, . . . acknowledge their tenancy, and . . . to restore [them] to possession . . . ."

With respect to the pleaded causes of action for "Wrongful Eviction in Tort" (First Cause of Action), "Breach of the Covenant of Quiet Enjoyment" (Second Cause of

Action), and "Breach of Implied Covenants of Quiet Enjoyment--Tort" (Third Cause of Action), appellants alleged the following. They were "in lawful, peaceable possession of the premises until they were forcibly evicted when [respondents] barred [them] from the premises and refused to reinstate [them] to possession." Respondents violated the PTFA by failing to recognize appellants' lease and engaged in unlawful, extrajudicial self-help eviction. Respondents "acted with malice by barring [appellants] from the property and misrepresenting to police officers that [they] were not tenants, and refusing to allow [them] access to the Property . . . ." It was further alleged with respect to the second and third causes of action that respondents "breached the covenant of quiet enjoyment embodied in Civil Code section 1927" by the foregoing course of conduct.

2. *Breach of Implied Covenant of Quiet Enjoyment*

Where an immediate successor takes subject to a bona fide lease by operation of the PTFA, the scope of a California tenant's right of occupancy for the remainder of the lease term must be derived from the lease itself and California law, which implies a contractual covenant of quiet enjoyment.[5] (See Civ. Code, § 1927, see also Civ. Code, § 1925.)

"It has long been the rule that in the absence of language to the contrary, every lease contains an implied covenant of quiet enjoyment. [Citations.] Initially, the covenant related solely to the right of possession and only protected the lessee against any act of molestation committed by the landlord or anyone claiming under him, or by someone with paramount title, which directly affected the tenant's use and possession of the leased premises; the covenant was construed to protect the lessee against physical interference only. [Citation.] In recent years, the covenant of quiet enjoyment has been

---

[5]     A lease's covenant of quiet enjoyment runs with the land and binds successors in interest by privity of estate. (See *Stillwell Hotel Co. v. Anderson* (1935) 4 Cal.2d 463, 467-468; see also *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 353, fn. omitted; Civ. Code, §§ 1460, 1462-1463.)

31

expanded, and in this state, for example, it insulates the tenant against any act or omission on the part of the landlord, or anyone claiming under him, which interferes with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy. [Citation.]"  (*Petroleum Collections Inc. v. Swords* (1975) 48 Cal.App.3d 841, 846; see *Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 589-590.)

It is not necessary to show that the landlord acted with the subjective intent to compel the tenant to leave the property or deprive the tenant of quiet enjoyment.  (*Pierce v. Nash* (1954) 126 Cal.App.2d 606, 613, 614, fn. 1.)  There is a "presumption that a landlord intends the natural and probable consequences of his acts; and where the acts of the landlord effectively deprive the tenant of the use and enjoyment of the premises, the intent to evict is implied from the character of the acts done.  [Citations.]"  (*Id*. at pp. 613-614, fn. omitted.)

"[A]ny disturbance of the tenant's possession by the lessor or at his procurement . . . which has the effect of depriving the tenant of the beneficial enjoyment of the premises, amounts to a constructive eviction, provided the tenant vacates the premises within a reasonable time.  [Citations.]"  (*Id*. at pp. 612-613; see *Kulawitz v. Pacific Woodenware & Paper Co.* (1945) 25 Cal.2d 664, 670 ["Any interference by the landlord by which the tenant is deprived of the beneficial enjoyment of the premises amounts to a constructive eviction if the tenant so elects and surrenders possession, and the tenant will not be liable for rentals for the portion of the term following his eviction.  [Citations.]"].)  The Supreme Court stated in *Standard Live Stock Co. v. Pentz* (1928) 204 Cal. 618, 625, that "the covenant of quiet possession in a lease is not breached until there has been an actual or constructive eviction."  Nevertheless, some authorities recognize that a tenant may sue for breach of the covenant while remaining in possession.  (See e.g. *Guntert v. City of Stockton* (1976) 55 Cal.App.3d 131, 141; see also *Andrews v. Mobile Aire Estates,*

32

*supra,* 125 Cal.App.4th at pp. 590-591 [relying on *Guntert*], *Marchese v. Standard Realty & Dev. Co.* (1977) 74 Cal.App.3d 142, 148 [same].)

"[A] landlord's interference with the tenant's right of ingress and egress may constitute a constructive eviction. [Citation.] . . . [L]ittle difference can be found between the act of physical removal and the act of preventing entry." (*Donoghue v. Kremmel* (1932) 121 Cal.App. 208, 211.) Thus, "where a tenant is denied entry and this denial is coupled with threats of violence upon attempted entry, which threats are sufficient to cause a reasonable [person] to anticipate and fear bodily conflict or injury, the tenant is justified in treating the denial as an eviction." (*Ibid*.)

"Determining whether there has been a breach of the covenant of quiet possession generally 'depends upon the facts in a proper case.' (*Stockton Dry Goods Co. v. Girsh* (1951) 36 Cal.2d 677, 682 . . . ; see also, e.g., *Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 593 . . . ) [¶] Breach can take many forms, including actual or constructive eviction. (See, e.g., *LaFrance v. Kashishian* (1928) 204 Cal. 643, 644 . . . [covenant breached where 'plaintiff was evicted from the leased premises by one who had established paramount title to the property']; *Guntert v. City of Stockton*, *supra*, 55 Cal.App.3d at p. 139 . . . ['arbitrary and unreasonable notice of termination violated the lessor's implied obligation to abstain from interference with the tenant's use and enjoyment of the premises']; *Goldman v. House* (1949) 93 Cal.App.2d 572, 576 . . . [under the covenant of quiet enjoyment, 'attempt to evict by the use of wrongful and malicious means with knowledge of probable injury is actionable']; see *id.* at p. 574 . . . ['defendants wilfully and maliciously shut off the electric current' and the tenant 'fell down the darkened stairway and sustained injuries'].)" (*Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1035.)

Civil Code section 3300 provides the measure of contract damages for breach of the covenant of quiet enjoyment implied in a lease. (See *Standard Live Stock Co. v. Pentz*, *supra*, 204 Cal. at p. 642; see also Civ. Code, § 1927.)

3. *Tortious Wrongful Eviction*

California recognizes the tort of wrongful conviction. (See *Barkett v. Brucato* (1953) 122 Cal.App.2d 264, 275.) "The same basic policy against forcible or other wrongful ouster that gives the tenant the summary remedy to obtain restoration of possession . . . gives the tenant a tort action for damages for wrongful eviction. [Citations.]" (12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 758, p. 882.) "An essential element of a wrongful eviction claim is that the tenant has vacated the premises. [Citations.]" (*Ginsberg v. Gamson* (2012) 205 Cal.App.4th 873, 900.)

In *Tooke v. Allen* (1948) 85 Cal.App.2d 230, the trial court found that the landlord, " 'together with certain of his employees, acting under his direction, entered upon and carried out a campaign of annoyance designed to force the plaintiff to vacate said apartment by interfering repeatedly with and violating her right to the peaceable possession thereof . . . [.]' " (*Id*. at pp. 232-233.) The landlord claimed that the tenant was improperly "seeking to recover upon many causes of action founded on separate torts" but the court "construed the complaint as stating a single cause of action arising out of a continuous course of conduct on the part of defendant, intended and calculated to disturb and destroy plaintiff's peaceful possession of her dwelling place." (*Id*. at p. 234.) The appellate court upheld the trial court's determination, observing that the gravamen of the tenant's cause of action was "for interference with her right of peaceful possession" and a tenant has the "right to recover damages for deprivation of peaceful possession occasioned by a succession of a [landlord's] wrongful acts . . . ." (*Id*. at p. 236.)

A tenant who is wrongfully evicted by his landlord before the expiration of the lease term may maintain a wrongful eviction action for tort damages and punitive

34

damages, if appropriate.  (See *Stoiber v. Honeychuck* (1980) 101 Cal.App.3d 903, 926; *Tooke v. Allen*, *supra*, 85 Cal.App.2d at p. 239; Civ. Code, § 3333; 3294.)

C.  *Evidence*

1.  *Stipulated Facts*

The parties stipulated to the following facts.  At all relevant times, Deutsch Bank was the owner of the property at 1156 Stoneylake Court in Sunnyvale, California ("Stoneylake property"), which included both a single family home and a two-bedroom converted garage unit.  At all relevant times, AHMSI acted as Deutsche Bank's agent with respect to the Stoneylake property.  At all relevant times, Deutsche Bank "authorized, approved and/or ratified" AHMSI's action with respect to the Stoneylake property and AHMSI's dealings with appellants Nativi and Perez.

2.  *Undisputed Facts*

The following facts were not disputed in this case.  Appellants Nativi and Perez rented a converted garage unit on the Stoneylake property from Cazzali, the former owner.  Deutsche Bank was the beneficiary under the deed of trust securing the note on which Cazzali defaulted.  The Bank obtained title to the Stoneylake property on August 6, 2009 by purchasing it at the nonjudicial foreclosure sale.

AHMSI was the servicer and was responsible for preparing the property for sale on the open market.  AHMSI retained the services of Advisors in San Jose, California to assist with the sale.  At all relevant times, Paulette Diaz and Paul Dougherty were employees of Advisors.

Appellant Nativi was in El Salvador from August 20, 2009 to October 26, 2009. Appellant Perez was in Texas for about two weeks, from approximately September 5, 6, or 7, 2009 until the middle of September. When Perez departed for Texas, nothing was amiss.  While Perez was away in Texas, appellants' "belongings were discarded from their garage unit home into the backyard . . . ."

When Perez returned home and discovered his belongings had been removed, he knocked on the door of main house and three people whom he did not recognize came to the door. When he asked why his apartment had been emptied into the yard, the police were called. When the police learned that the house was in foreclosure, Perez was told to leave. Perez has no idea who removed their personal belongings from the garage unit and discarded them in the backyard.

Appellant Nativi first learned what happened on October 24, two days before she returned from El Salvador.

The last of the occupants of the Stoneylake property were evicted in March or April 2010 by way of an unlawful detainer proceeding.

3. *Evidence Submitted by Respondents' in Support of Summary Judgment*

Nativi and her son Jose moved into the garage unit on the Stoneylake property on June 1, 2007. Nativi knew the property owner's daughter, Veronica Cazzali (Veronica). Veronica and her two children lived in the main house. The converted garage had two bedrooms, a living room, a bathroom, and a kitchen. On June 1, 2007, Natavi signed a lease, which provided for monthly rent of $1,600. She signed another lease on June 1, 2008 and a third lease on June 1, 2009.

Natavi is a citizen of El Savador but she has lived in the United States for more than a decade. Nativi's son is Jose Roberto Perez Nativi. At the time of the foreclosure sale, Perez was 20 years old.

The Deutsche Bank National Trust Company is the trustee for "the American Home Mortgage Assets Trust 2007-5 Mortgage-Backed, Pass-Through Certificates, Series 2007-5." The note and deed of trust executed by Cazzali and secured by the Stoneylake property was one of the assets of that trust. In its individual capacity, Deutsche Bank National Trust Company "does not have any relationship with or authority to act with respect to loans held in trusts for which it is the trustee" and it "did

36

not act or direct that any actions be taken with respect to the loan and property made a subject of this case."

At all relevant times, AHMSI was servicer and attorney-in-fact for Deutsche Bank with respect to the note, the deed of trust, and the Stoneylake property. AHMSI was responsible for preparing the property for sale on the open market. It retained the services of Advisors to accomplish that end.

Advisors is a real estate company dealing mainly with foreclosures. Foreclosed properties are assigned to Advisors by a servicer, which acts on behalf of banks. The Stoneylake property was assigned to Advisors. AHMSI's website indicates whether the servicer wants Advisors to try to work out a "cash for keys" arrangement with the occupants.

Diaz had worked for Advisors since February 2008, and, at the time of her deposition in December 2010, she had worked in the real estate industry for 17 years. At the time of his deposition in February 2011, Dougherty had worked for Advisors for about two and a half years.

At the time of her deposition in December 2010, Diaz had not received any training in working with foreclosed properties or eviction law. She had never seen an eviction notice or written a three-day or 90-day notice. She had not consulted any manual when she was dealing with the Stoneylake property. Diaz was not a real estate agent or broker.

Before working for Advisors, Dougherty had been an iron worker. He was not a real estate agent. He had not received any training regarding unlawful detainers.

Dougherty's job involves driving to foreclosed properties, taking photographs of the properties, and contacting the people still living there. Each morning he receives a list of properties to visit after he clocks in. Unless there is a "no contact" instruction, he

37

knocks on doors and attempts to obtain the names and phone numbers of the persons still living on the property.

Dougherty does not speak Spanish. He does not bring an interpreter with him. If persons living on a property do not speak English, they communicate "however they can." Dougherty writes down contact information he obtains and turns it in at the end of the day. Sometimes Dougherty asks the person to write down his or her name if Dougherty does not know the spelling or is unable to understand what the person said. He tries to find out whether the person is a tenant or a former owner. Even if a person says he or she is a tenant, Dougherty does not ask for a copy of the lease. The information that Dougherty obtains is inputted into Advisors' computer system by another employee of Advisors.

Dougherty also provides notices to occupants as directed by the financial institution. Advisors has a standard letter, which explains the property is now owned by the bank, asks occupants to please get in touch with Advisors to work out relocation assistance, and provides a phone number. Dougherty sometimes posts a "No Trespassing" notice, a PG &E notice, or a "Cash for Keys" (CFK) notice.

Diaz is a premarketing assistant. Her job is to contact the occupants, notify them of the foreclosure, and determine whether they have a valid lease agreement, the amount of monthly rent, and whether they are related to the previous owner. She does not speak Spanish. She offers relocation assistance to the occupants as instructed by the bank. The bank specifies a dollar amount and time frame for relocation assistance. If the occupants do not take the assistance offer, Advisors waits for eviction. Once the property is vacant, Diaz orders utilities and makes sure the property is ready to be placed on the market.

Dougherty visited the Stoneylake property a number of times. Diaz never visited the property.

38

When Dougherty went to the property on August 6, 2009, he filled out a form entitled "REO Initial Inspection Checklist." He recalled seeing several Latino, Spanish-speaking adults and children, walking in and out of the front door of the house. Dougherty recalled speaking to a person who spoke English, a younger woman whose name he believed was Larisa. He was told that the property was tenant occupied. Larisa said that she had rented the main house from a "Veronica Cassalli" and they had just moved in. Dougherty was given the telephone numbers for a few people, including "Veronica Cassalli." Dougherty was told that the former owner's son lived in the garage. Dougherty did not look in the garage unit or go into the backyard. He gave a CFK notice to the occupants of the main house. The checklist form had a check next to "Take CFK letter with you" and a notation on the form that says, "Gave to Larisa G."

After Dougherty reported that people were living in the main house on the Stoneylake property, Diaz spoke by telephone to a female occupant of the main house, a Yessica. The purpose of the call was to offer relocation assistance. Diaz told Yessica that the bank now owned the house and it wanted the property to be vacated. Yessica was confused and upset. Yessica said she had rented the house from the foreclosed owner and given a deposit and she and her family had just moved in the previous Saturday, which Diaz believed was the beginning of August. Diaz believed that she offered $10,000 for vacating the property within 30 days. Yessica told Diaz that there was also a garage unit and that a relative of the foreclosed owner occasionally stayed there but the relative did not reside there. Diaz asked Yessica to speak with the occupants of that unit and let them know about the relocation assistance offer. Every tenant on the property had to leave to be entitled to the money.

During his next visit to the Stoneylake property, Dougherty contacted a male in his early 20's with black hair at the garage unit and was invited in. The unit was furnished and had all the signs that people were living there. Dougherty did not ask for a copy of

39

the lease. Dougherty handed him the CFK notice. The checklist form for this visit, dated August 18, 2009, had a check next to "Take CFK letter with you" and a notation on the form that says, "Gave to Robert" At the time of his deposition in February 2011, Dougherty was not sure if he had spoken to Robert or a friend of Robert. At his deposition, Perez recalled receiving a paper from Caucasian male around the beginning of August.

The August 18, 2009 checklist reflects that Dougherty made contact with the occupants of the garage and took down a phone number for a Robert Nativi. Diaz telephoned that number and left a couple of messages. When she reached someone and asked for the tenant, Diaz was told she had the wrong number.

Dougherty was not told that Robert planned to be out of town for several weeks. Dougherty never spoke with "Ms. Nativi."

Dougherty did not recall ever asking for a lease from anyone living in either the garage or the main house on the Stoneylake property. He acknowledged that he did not have a way to distinguish between a tenant and a squatter.

On August 20, 2009, Nativi traveled to El Salvador for a gallbladder operation and remained there for about two months.

Diaz spoke with the people living in the main house multiple times. Someone named Yessica told her that two males were in the garage unit. Yessica said that Cazzali had decided to return the deposit; Yessica and her family voluntarily left the main house without being paid to relocate.

When Perez left for Texas in early September 2009, the garage unit was fine.

Sometime in the beginning of September 2009, new occupants moved into the main house. Diaz spoke with Luis by telephone. He said that he was living there with his parents. Luis was upset when he learned that Cazzali did not own the property and she had no right to rent the main house. Diaz never spoke with Cazzali.

40

Diaz spoke with Luis a number of times. Diaz asked Luis about tenants in the garage. He said that the property was vacant when they moved in but there were items left in the backyard that Cazzali had said she was going to donate. From this comment, Diaz inferred that Cazzali was the person who had taken the items out of the garage unit.

Diaz was unsure whether relocation assistance was offered to this second set of renters. She might have mentioned to the servicer that the previous owner was recycling tenants and inquired whether to offer relocation assistance but she could not recall getting a response.

When Perez returned to his Stoneylake property on September 22, 2009, he found all their belongings, including appliances and furniture, outside in the yard. He was accompanied by another friend and their girlfriends. The lock to the garage unit had not been changed and he went in. The unit had been emptied of their things. He went to the main house, knocked on the door, and three people whom he did not recognize answered. Perez told them that he lived in the other house and asked why his belongings had been thrown into the backyard; he was told that they were going to call the police. The police arrived. Perez gave Veronica's number to an officer. The officer left for a time and, when he returned, he told Perez that the house was in foreclosure and Perez could not stay there. Perez took some clothes that he could carry with him and he left. At the time of his deposition in May 2010, Perez still had no idea who had put their belongings into the backyard.

Luis left Diaz a message that he had called the police because an unidentified male, who claimed to live in the garage unit, was trying to break into the garage area. Luis was under the impression that he was renting the entire property including the garage.

When Diaz called Luis back, Luis said that he had told the man, "No, you don't [live here]. I live here. I don't know who you are, and I am not letting you in." Luis

related telling police that he was renting the property from Cazzali, nobody had been living there when he moved in, and he did not know the man. Diaz thought that the police had told the man he had to leave. At Diaz's deposition in December 2010, after she looked at a September 22, 2009 City of Sunnyvale Police Department report, which named Luis Ayala as the reporting party (RP), referred to Stoneylake Court, and stated "RP . . . having problem with four subjects, possibly squatters or trespassers," Diaz's memory was refreshed concerning the date Luis told her that he had called the police.

On September 23, 2009, Perez spoke to Veronica, who told him to call Diaz. When Perez telephoned Diaz, she said that she could not help him.

At her deposition, Diaz recalled receiving a call from Robert who said that he had been out of town, he wanted to get back in, and "he wanted to do relocation." Diaz recalled saying, "If you have the key, I can't stop you from letting yourself back in because I am still trying to work out relocation with everyone." Robert told Diaz he was one of the occupants of the garage but Luis would not allow him to go back in. According to Diaz, she said, "It is out of my hands, basically."

Robert was adamant about getting back into the property. Diaz told him, "I don't have a key. I didn't change locks. If you can get back in, I guess you can get back in. At this point in time, I am at a standstill. I can't do anything." Robert said that the occupant of the main house would not let him back in.

Diaz recalled that, at some point, Robert had said, "All of my stuff is in the backyard. Why is it back there? You removed [it]." According to Diaz, she disclaimed touching his "stuff" and told him that the main house tenant said all that stuff was already in the yard when he moved in. Diaz did not know whether Robert and Jose were one and the same person.

Perez did not tell his mother about the situation because she had gone to El Salvador for surgery and he did not want to bother her. Perez had nowhere to stay and no

car; he was homeless for a period. He eventually called Nativi's boyfriend, with whom he did not get along, and asked to stay with him.

On October 26, 2009, Nativi returned to the area. On October 29, 2009, Nativi went to the Stoneylake property to try to get into her unit. Nativi called the police and showed the responding officer her paperwork establishing that she had the right to live there. When Nativi saw her belongings outside in the yard, she cried. Her household furnishings and personal items had been removed. Nativi put some things in bags and removed decomposed leaves from a sofa. The officer left and, when he returned about a half an hour later, the officer told her that he had spoken with a tenant, the tenant had given him Paulette's telephone number, and the officer had spoken with Paulette. The officer told her to leave and not come back unless the bank called.

Naviti never met Diaz or spoke with her directly. Nativi does not speak English and understands very little English.

Diaz recalled speaking with a police officer on the telephone. Diaz was asked by a police officer, "Who has rights to the property." Diaz remembered telling the officer that she did not know, the property was in foreclosure, her job was to attempt to work out the relocation of the occupants, and, as far as she knew, Luis was the property's occupant. She told the officer that Luis had told her that he had a lease agreement with Cazzali and the property was vacant when he moved in and "[s]o I don't know where this other person is coming in." The officer indicated they would work it out. At her deposition, Diaz asserted that she did not "give any indication who had the right to be in the property because nobody really did."

A police report, dated October 29, 2009, described the incident. It stated that a former renter was present at the property and claimed that the new renters moved her items outside while she was on a two-month trip to South America. It reported that the current renters provided photographs showing that the items were already outside when

43

they moved into the house in August. The report stated that the house was bank-owned and residents have an arrangement with and pay rent to the bank. The reporting officer stated that he had spoken with Paulette, who works for the bank, and she had verified the renter's statement. During her deposition, Diaz asserted that the reporting officer had misunderstood what she had said.

According to Diaz, she told the police officer that the property had been foreclosed upon, the previous owner had rented the property to the tenants, and she was in the process of trying to get them removed. She asserted that she would never have said that the bank was accepting rent from the tenants because that was not true; the bank did not have any sort of rental agreement with them.

Diaz denied that she instructed the police to exclude Perez from the property at the end of September 2009 and she denied that she instructed the police to exclude Nativi from the property at the end of October 2009.

Diaz received a letter addressed to her from the Bay Area Legal Aid and she forwarded it to AHMSI. Diaz did nothing further. As far as Diaz knew, appellant Nativi and her son had not been allowed back into the property.

Dougherty visited the property on November 17, 2009. The checklist form for that date notes, "No access to garage." At his deposition, Dougherty explained that he could not get though the side gate because it had "several locks and ropes and chains around it." He tried knocking on the car garage door. Dougherty had not put ropes and chains on the gate and he had no idea who did. The checklist form had a check next to "Garbage/junk." Dougherty saw furnishings, clothing, trash in the front and rear yards. There were big piles. He had no idea who put those things there. No one had instructed Dougherty to take the furnishings out of the garage unit and throw them into the yard and he did not do it.

Luis and his family voluntarily moved out.

44

Dougherty's final December 29, 2009 checklist form for the Stoneylake Court property notes that the property "requires trash out [and] yard service . . . ."

A third set of people moved into the main house but Diaz did not have any communications with them. They were finally evicted in March 2010 through an unlawful detainer proceeding.

Advisors did not access the garage unit and remove possessions from it or instruct anyone else to remove them on its behalf.  Advisors did nothing to prevent appellants from recovering their possessions out in the yard.  Advisors did not deny a request from appellants to retrieve their property from the premises.

Neither AHMSI nor Advisors, nor anyone acting on their behalf, ever rented out the main residence.  Neither AHMSI nor Advisors, nor anyone acting on their behalf, ever denied appellants access or changed the locks to the garage unit.  Neither AHMSI nor Advisors, nor anyone acting on their behalf, ever entered the garage unit without consent or discarded appellants' personal belongings and furniture in the garage unit.  Neither AHMSI nor Advisors, nor anyone acting on their behalf, requested or instructed any of the post-foreclosure occupants of the main residence to remove the belongings and furniture from the garage unit.

4. *Appellants' Evidence Submitted in Opposition to Summary Judgment*

Nativi first moved into the Stoneylake property in June 2007 and, at that time, Cazzali was the owner.  Nativi is not related to Cazzali.

Nativi's apartment was reached by walking through a gate next to the main house into the backyard where the entrance to the apartment was located.  When she tried to access her apartment on October 29, 2009, the gate was padlocked and she could not get into her apartment.  She stated, "The police had to get the people in the main house to let me through the main house so that I could get to the door to my apartment."  Nativi never gave permission to anyone to remove her furniture and personal belongings from her

45

apartment. Nativi was removed from her home by police. Since she did not have enough money for the first and last month rental payments and security deposit on a new apartment for her son and herself, they slept on the floor of a friend's studio apartment, which was less than 15 feet by 15 feet.

On November 2, 2009, Nadia Aziz, a Bay Area Legal Aid attorney and one of the attorneys of record representing appellants, sent a letter informing Deutsche Bank that appellants had lost possession of premises and demanding that appellants be restored to the property. The letter, which was actually addressed to Diaz at Advisors, indicated that appellants had been tenants at the property for three years, they had rented the converted garage unit, and Nativi had prepaid rent to the former owner for the months of August and September 2009. A copy of the written lease, which was attached to the letter, indicated that the lease term continued through June 1, 2010. The letter asserted that the federal PTFA requires a bank to honor a tenancy agreement for the remaining term of the lease if the lease was entered before the foreclosure sale. It requested that appellants "be compensated for damage to their property as a result of the new tenants illegally entering their unit and throwing their property out at your instruction" and that appellants "be restored to the premises and be allowed to remain in the premises until the end of the lease term on June 1, 2010."

Deutsche Bank responded by letter, dated November 9, 2009. Counsel for Deutsche Bank stated in the letter that it had not rekeyed the property, disposed of appellants' personal property, or taken possession of the property and it had not instructed anyone else to do so. The letter advised that appellants would "have to regain access to the Property, and seek redress for their alleged damages, from the persons responsible." In the letter, counsel asserted that appellants were entitled only to a 90-day notice to vacate, which had been posted on the property on August 25, 2009. The letter warned that if appellants failed to vacate the premises by November 23, 2009, eviction

46

proceedings would be commenced against them to recover possession and to obtain damages for their unlawful detention of the property.

5. *Supplemental Evidence Submitted by Respondents*

Respondents submitted a supplemental declaration of their attorney Charles McKenna together with a special interrogatory response from Nativi and an excerpt from Nativi's deposition testimony. A special interrogatory asked Nativi to describe the circumstances of her alleged denial of access to her unit. Nativi responded: "On October 29, 2010, the police refused to let [her] into her unit after . . . Diaz, who had knowledge of [her] tenancy, told the police officer that [she] had no right to be in the unit. On November 9, 2009, [her] counsel requested that [she] be allowed to regain possession to the unit and [the Bank's] attorneys refused." The deposition testimony was part of the same testimony previously submitted, which indicated that Nativi retrieved some belongings and put some clothing in plastic bags.

Respondents also belatedly submitted the supplemental declaration of Christy Gunvalsen, which was not referenced in their Separate Statement of Undisputed Material Facts. Gunvalsen stated, "[i]n the course and scope of my employment as Neighborhood Preservation Officer, I have access to and am a custodian of records for the City of Sunnyvale's Department of Public Safety file pertaining to the real property at 1156 Stonylake [*sic*] Court, Sunnyvale, California." According to Gunvalsen, "[a]t all times, the converted garage apartment at the 1156 Stonylake [*sic*] Court property has constituted an illegal unit, in violation of the applicable City of Sunnyvale municipal ordinances."

6. *Supplemental Evidence Submitted by Appellants*

Appellants also submitted the declaration of Madeline Howard, another attorney representing appellants. She indicated that, despite diligent efforts, appellants had been unable to contact Officer Alan Harnett until July 21, 2011 and had not been able to obtain

a sworn declaration from him until August 17, 2011.  His declaration was attached to her declaration.[6]

Officer Harnett stated that he was a Detective for the Department of Public Safety for the City of Sunnyvale, California.  On October 29, 2009, he responded to a call at 1156 Stoneylake Court in Sunnyvale.  When he arrived at the property, Nativi informed him that she was tenant in the garage, she had just returned from an extended trip, people had moved into her home, and her belongings had been removed from her home.  He observed personal property, which looked damaged, in the back and side yard.  He spoke with the people living in the main house, who told him that they had made arrangements with, and were paying rent to, the bank which owned the house.  The people said the place was empty when they moved in and showed him "pictures of the personal property in the backyard."  He had spoken with a bank representative, Paulette, who told him that "the people living in the main house were the only ones who had a right to be at the property and that Ms. Nativi had no right to be there."  Consequently, Nativi was told she had to leave. The officer's incident report was attached to his declaration.

Attorney Howard's declaration further explained that Walker (AHMSI's Assistance Vice President, whose declaration was submitted in support of summary judgment) failed to appear for her noticed deposition on July 28, 2011 and she was not produced until August 11, 2011.  Walker acknowledged in her August 11, 2011 deposition testimony that she had never directly talked to anybody at Advisors and she had never been to the property.  She indicated that the information in her declaration regarding post-foreclosure occupants came from her attorney.

---

[6]     Respondents objected to Officer Harnett's declaration concerning statements made to him on grounds of hearsay and lack of personal knowledge.  Insofar as he was merely reporting what was said to him and the statements were not being proffered for the truth of matter stated, the objections were meritless.  (See Evid. Code, §§ 702, 1200.)

D. *Triable Issues of Material Fact*

The evidence is uncontroverted that appellants were living in a garage unit on the Stoneylake property under a year-long lease at the time of foreclosure, their belongings were taken out of the unit and dumped outside, and each of them was turned away and directed to leave when they separately tried to return after a temporary absence.

Respondents presented evidence that with respect to the Stoneylake property, the Bank was acting through AHMSI, which hired Advisors. The evidence showed that AHMSI, Advisors, and those acting on their behalf with respect to the Stoneylake property, did not take appellants' personal property out of the garage unit or instruct any of the post-foreclosure occupants of the main residence or anyone else to do so. Respondents produced evidence that AHMSI, Advisors, and those acting on their behalf, did not change the locks to the garage unit or deny appellants access to the unit. Their evidence showed that neither AHMSI nor Advisors rented the main house to any of the groups of post-foreclosure occupants. Respondents also produced evidence showing that Diaz only learned of the September 2009 incident in which Luis had called the police after it occurred and Diaz had not instructed the police to exclude appellant Perez from the property. Further, their evidence indicated that Diaz did not instruct the police to exclude appellant Nativi from the property at the end of October 2009. Accordingly, respondents made a sufficient showing to meet their burden and shift the burden to appellants to produce sufficient admissible evidence to show the existence of a triable issue of material fact. (See § 437c, subds. (d) & (p)(2); *Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at pp. 850-851, 853-854.)

On appeal, appellants claim that triable issues of material fact remain with respect to the Bank's liability for breach of the covenant of quiet enjoyment on the following theories: (1) by offering cash for keys deals to occupants of the Stoneylake property, it

49

was foreseeable that "one of the short-term tenant[s] would do whatever was necessary to secure that prize, including ridding the property of [appellants] and their possessions," (2) failing to reinstate appellants to the premises after appellants tried to enter their rental unit because Diaz knew, or should have known, that appellants had a right to return there and (3) refusing to assist them in regaining possession of the leased premises in response to their attorney's November 2009 demand letter.

Appellants cite *Andrews v. Mobile Aire Estates, supra,* 125 Cal.App.4th 578 for the principle that a landlord may breach the covenant of quiet enjoyment by failing to take action when a third-party disturbs a tenant's quiet enjoyment where the landlord has the ability to rectify the situation but refuses to do so.  The case does not stand for this broad proposition.

Although *Andrews* recognized "[t]he perpetrator of the interference with the tenants quiet enjoyment need not be the landlord personally," it also observed that "an actionable breach" may occur "where the interference is caused by a neighbor or tenant *claiming under the landlord.*  (*Petroleum Collections Inc. v. Swords*, *supra*, 48 Cal.App.3d at p. 846 . . . ; see, e.g., *Lee v. Placer Title Co.* (1994) 28 Cal.App.4th 503, 512 . . . [shopping center tenant claimed covenant was breached by landlords failure to remedy ventilation problems caused by adjoining dry cleaning business].)"  (*Id.* at p. 590, fn. omitted, italics added.)  In *Andrews*, the interference with tenants' quiet enjoyment was caused by a disruptive tenant who leased the adjacent space in a mobile home park from the park owner.  (*Id.* at pp. 583.)

Unlike the present case, *Andrews* involved the Mobilehome Residency Law (Civ. Code, § 798 et seq.), which "regulates relations between the owners and the residents of mobilehome parks." (*Cacho v. Boudreau* (2007) 40 Cal.4th 341, 345.)  *Andrews* observed that the Mobilehome Residency Law "expressly preserves the park owners['] ability to secure the quiet enjoyment of mobilehome park tenants by authorizing park

50

owners to pursue eviction or injunctive relief against offending tenants." (*Andrews*, *supra*, 125 Cal.App.4th at p. 592.)

The appellate court in *Andrews* stated: "A mobile home park owner cannot disregard conduct by a tenant upon the park premises that constitutes a substantial annoyance to other homeowners or residents. (Civ. Code, § 798.56, subd. (b).) Faced with such a situation, the covenant of quiet enjoyment requires a reasonable response by the landlord, which may include conducting an investigation and thereafter, taking appropriate action, which may include, inter alia, the issuance of a warning to the offending party, the pursuit of injunctive relief against the tenant to enjoin the violation (*id*., § 798.88), or, if necessary, the commencement of eviction proceedings (*id*., § 798.56)."[7] (125 Cal.App.4th at p. 597.) It concluded that the trial court erred by granting summary judgment on the breach of contract claim on the ground Mobile Aire had no duty under the lease to evict the disruptive tenant because there were triable issues of material fact "whether the level of interference by [the disruptive tenant] was sufficient to amount to a deprivation of the [complaining tenants'] right to quiet enjoyment, whether Mobile Aire had notice of the interference, the nature of any investigative and corrective measures a reasonable landlord should have taken (e.g., a warning, a petition for injunctive relief pursuant to Civ. Code § 798.88, or other measures to secure [the

---

[7]     Civil Code section 798.88, provides in part: "(a) In addition to any right under Article 6 (commencing with Section 798.55) to terminate the tenancy of a homeowner, any person in violation of a reasonable rule or regulation of a mobilehome park may be enjoined from the violation as provided in this section. [¶] (b) A petition for an order enjoining a continuing or recurring violation of any reasonable rule or regulation of a mobilehome park may be filed by the management . . . ." Civil Code section 798.56, subdivision (b), of the Mobilehome Residency Law requires a tenancy to be terminated by the management when "[c]onduct by the homeowner or resident, upon the park premises . . . constitutes a substantial annoyance to other homeowners or residents."

51

disruptive tenant's] compliance), and thereafter, the extent of the [complaining tenant's] recoverable damages."  (*Id*. at p. 593.)

Respondents take the position that they had no obligation to act, citing *Sarina v. Pedrotti* (1930) 103 Cal.App. 203, 206-207, which stated:  "The landlord's covenant of quiet enjoyment and possession of leased premises 'is equivalent to a stipulation that the lessee shall not be rightfully disturbed in his possession during the term, not that he shall not be disturbed at all.  The lessor is not responsible under the covenant for the acts of a mere trespasser, though the effect of the trespasser's acts may be to deprive the lessee of the benefits of the lease, the latter's remedy being against the trespasser, not against the lessor.'  15 Cal.Jur. 635."  That statement accurately conveys the traditional view concerning the extent of a landlord's liability under an express or implied covenant of quiet enjoyment.  (See *Carty v. Blauth* (1915) 169 Cal. 713, 718 ["It is a general rule that an express or implied covenant for quiet possession secures the lessee against acts or hindrances of the lessor and persons deriving their title through him, or from a paramount title, but not from the acts of strangers.  [Citations.]"]; *McDowell v. Hyman* (1897) 117 Cal. 67, 70-71 [" 'This covenant, whether expressed or implied, means *that the tenant shall not be evicted* or disturbed by the lessor or by persons deriving title from him, or by virtue of a title paramount to his, and implies no warranty against the acts of strangers.  It is equivalent to a stipulation that the lessee shall not be rightfully disturbed in his possession during the term, not that he shall not be disturbed at all.' [Citation.]"]; *Playter v. Cunningham* (1862) 21 Cal. 229, 233 ["The lessor is responsible upon the covenant for his own acts, and for the acts of others claiming by title paramount to the lease, but he is not responsible for the acts of a mere trespasser.  The effect of these acts may be to deprive the lessee of the benefit of the lease, but the remedy is against the person by whom the acts were committed, and not against the lessor."]; see also *Lost Key Mines v. Hamilton* (1952) 109 Cal.App.2d 569, 573.)

We recognize, however, that "a landowner cannot interfere with his tenant's possession or enjoyment by allowing others to enter upon the land. [Citation.]" (*Brown Derby Hollywood Corp. v. Hatton* (1964) 61 Cal.2d 855, 858.) A residential tenant has a "right to recover damages for deprivation of peaceful possession occasioned by a succession of [a landlord's] wrongful acts" that result in constructive eviction. (*Tooke v. Allen*, *supra*, 85 Cal.App.2d at p. 237.) A "landlord is bound to refrain from action which interrupts the tenant's beneficial enjoyment. [Citations.]"[8] (*Guntert v. City of Stockton* (1976) 55 Cal.App.3d 131, 138.)

In considering whether the evidence would allow a reasonable trier of fact to find the Bank, as landlord, was liable for breach of the covenant of quiet enjoyment or wrongful eviction in the unusual circumstances of this case, we find section 6.1 of the Restatement Second of Property, Landlord and Tenant, helpful. It provides in part: "Except to the extent the parties to a lease validly agree otherwise, there is a breach of the landlord's obligations if, during the period the tenant is entitled to possession of the leased property, the landlord, *or someone whose conduct is attributable to him*, interferes with a permissible use of the leased property by the tenant." (Rest.2d Prop., Landlord and Tenant, § 6.1, italics added, pp. 222-223.) Comment b to that section explains: "An unauthorized possession of all or any part of the leased property by the landlord, or someone whose conduct is attributable to him, is an eviction of the tenant that could be cured by the tenant himself. The rule of this section does not require [the tenant] to take the legal steps available to him to eliminate the eviction, although that option is open to him. Instead he may treat the landlord as in default and pursue the remedies available to him under this section for the default." (*Id*. at p. 223.)

---

[8]     In addition, landlords have a limited duty to tenants, "arising out of their special relationship, to take reasonable measures to secure areas under the landlord's control against foreseeable criminal acts of third parties. [Citations.]" (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213.) Appellants did not plead any such tort theory.

Another comment to that Restatement provision states: "Possession of the leased property by a third person, or other conduct thereon by a third person, without the consent of the tenant, will be attributable to the landlord, so that the tenant can invoke the rule of [section 6.1 of the Restatement Second of Property], only if the landlord is *a contributing factor* to the unauthorized possession or conduct by the third person." (Rest.2d Prop., Landlord and Tenant, § 6.1, com. c, p. 225, italics added.) Another comment thereto provides: "The landlord is not in default under the rule of this section unless he fails to eliminate the interference promptly after a request to do so. Prompt elimination means immediately if the interference is the conduct of the landlord himself, and as soon as possible if the conduct which must be stopped is that of a third person that is attributable to the landlord." (Rest.2d Prop., Landlord and Tenant, § 6.1, com. e, p. 227.)

Keeping these principles in mind, we now sequentially examine appellants' claims, beginning with the cash for keys offers. With respect to this theory, appellants argue that the cash for keys offers provided "a strong financial incentive to rid the Stoneylake property of the Nativis and their possessions." They cite *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 43, which concerned a wrongful death tort action based on the death of a driver who was forced off the highway by a negligent radio listener who was pursuing a disc jockey's automobile to the next stop to collect a cash prize being offered on the radio. (*Id*. at pp. 43-45.) The primary question before the Supreme Court was "whether defendant [radio station] owed a duty to decedent arising out of its broadcast of the giveaway contest." (*Id*. at pp. 45-46.) Insofar as appellants' opposition suggests a tort duty arose out of the "cash for keys" offers, it raises issues outside the pleadings. "It is well settled that documentary evidence filed in opposition to a defendant's motion for summary judgment may not create issues outside the pleadings, nor is it a substitute for

54

an amendment to the pleadings. [Citation.]" (*Robinson v. Hewlett-Packard Corp.* (1986) 183 Cal.App.3d 1108, 1132.)

Furthermore, appellants presented no evidence that a "cash for keys" offer prompted someone to dispossess appellants by taking all their property out of the garage unit. The trial court ruled that Nativi's statement that an occupant of the main residence told her that the bank instructed her to remove the items was hearsay. Appellants submitted no other evidence that any post-foreclosure occupant understood a "cash for keys" offer as an instruction or invitation to remove appellants' property from the garage unit and acted accordingly. The evidence produced indicated that the first two groups of post-foreclosure occupants with whom Dougherty or Diaz had contact voluntarily left the property without participating in any "cash for keys" offer.

Appellants failed to present sufficient evidence from which a trier of fact could conclude that the dumping of all their property was attributable to the Bank or those acting on its behalf based on a "cash for keys" offer proffered by Advisors.[9] Consequently, neither the Bank nor those acting on its behalf were required to promptly remedy that situation to avoid liability for breach of the implied covenant of quiet

---

[9] Appellants did not produce evidence that the Bank, or those acting on its behalf, directed or acquiesced in the removal of their personal property from the garage unit. (Cf. *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1015, 1032-1033, 1036 [summary adjudication on breach of covenant of quiet enjoyment claim precluded where there was evidence that landlords acquiesced in removal of furniture from apartment and their maintenance worker changed the locks at the direction of resident's former employer who had leased the premises; *Tooke v. Allen*, *supra*, 85 Cal.App.2d 230, 233 [landlord, or his employees acting under his direction, interfered with tenant's peaceable possession through "campaign of annoyance" that included breaking her lock, entering her apartment, and removing "a typewriter, clothing, wearing apparel and other personal belongings and keepsakes"].)

enjoyment.[10] (See Rest.2d Prop., Landlord and Tenant, § 6.1, pp. 222-223, & coms. c and e thereto, pp. 225, 227.)

We turn next to appellants' claim that Diaz should have investigated their claims that they were tenants, Diaz knew or should have known that they had a right to return to the garage unit, and respondents breached the covenant of quiet enjoyment by failing to restore appellants to the garage unit. The evidence indicates that Advisors' employees initially learned that someone was living in the garage at the time of foreclosure. When appellant Perez tried to return home in September 2009 after being away, he found that all his family's things been removed from the garage unit and strangers were living in the main house. Diaz learned of the incident only after the fact.

Appellants did not produce admissible evidence that the post-foreclosure occupants who prevented appellant Perez from returning to live in the garage unit in September 2009 were claiming as tenants under the Bank.[11] Consequently, even if *Andrews v. Mobile Aire Estates*, *supra*, 125 Cal.App.4th 578 is understood as requiring a landlord to take action against a tenant who is disrupting the quiet enjoyment of another tenant, appellants did not produce evidence showing that it applied to the conduct of that second group of post-foreclosure occupants. Appellants failed to provide evidence from which a reasonable trier of fact could infer that the conduct of the Bank, or anyone acting on its behalf, was a cause ("a contributing factor") of the actions that kept appellant Perez

---

[10]    Even assuming that the first group of post-foreclosure occupants were bona fide tenants based on the evidence showing that they were already residing in the main house on the Stoneylake property when Advisors' employee Dougherty visited the property on the date of foreclosure, the evidence indicated that Advisors only learned appellants' belongings had been taken out of the garage unit after the second group took up residence, which suggests that the Bank, or those acting on its behalf, could not have taken any remedial action with respect to that initial group of occupants.
[11]    The trial court ruled that statements made by various post-foreclosure occupants that they were renting from "the bank" were hearsay.

56

from returning to live in the garage unit during that September 2009 incident and, therefore, those actions were attributable to the Bank and the Bank, or those acting on its behalf, were required to take remedial action to avoid breach of the implied covenant of quiet enjoyment. (See Rest.2d Prop., Landlord and Tenant, § 6.1, pp. 222-223, & coms. c and e thereto, pp. 225, 227.)

Respondents' evidence indicated that Diaz subsequently received a telephone call from a male, whom she knew as Robert and who appears to have been appellant Perez. The caller said that he was a tenant in the garage and he wanted to get back in but a person in the main house had not let him on the property. Diaz told him she could not do anything. No evidence was produced that, as of that point in time, the Bank, or anyone acting on its behalf, had interfered with appellants' possession or quiet enjoyment.

Nevertheless, we find Advisors' failure to ascertain whether appellants were bona fide tenants of the garage unit troubling, especially after Diaz was made aware of the plight of appellant Perez. In our view, the PTFA's protection of bona fide tenancies for a term would be empty if it did not impliedly impose a legal duty on immediate successors in interest in foreclosed properties to make reasonable efforts to identify all bona fide tenants and determine whether they are entitled to continue as tenants under a bona fide lease for the remainder of the lease's term. This duty may, under the particular circumstances, include requesting a copy of a lease, if any, from persons living on the premises or claiming to be tenants. We see nothing in the Act that places the onus on tenants, who may be unsophisticated or lack resources, to provide this proof without request.

We recognize that a successor in interest's failure to reasonably determine whether residential occupants of foreclosed property are bona fide tenants does not in itself amount to constructive eviction or substantial interference with a permissible use of the property. Nevertheless, where a successor in interest in foreclosed property fails to

57

reasonably identify a person as a bona fide residential tenant of the property and, in its dealings with others concerning rightful occupation of the property, unreasonably fails to inform or misinforms a third-party as to the bona fide tenant's right to occupy leased premises, such omission or conduct by the successor may, under particular circumstances, constitute a "contributing factor" to that third-party's interference with the bona fide tenant's possession and quiet enjoyment and render that interference attributable to the successor in interest. (See Rest.2d Prop., Landlord and Tenant, § 6.1, pp. 222-223, & com. c thereto, p. 225.)

The evidence indicates that, about a month after appellant Perez was turned away, appellant Nativi tried to return to the garage unit. The police were called and an officer spoke with the occupants of the main house on the Stoneylake property. After he spoke with Diaz by telephone, the officer directed appellant Nativi to leave and not return unless the bank called. Appellants produced the declaration from Officer Harnett, who had responded to the property when appellant Nativi was trying to get back into her home on October 29, 2009.[12] According to the officer, Diaz made affirmative representations to him that Nativi was not a tenant and she had no right to be on the property and, consequently, he told Nativi to leave. We believe this evidence raises triable issues of material fact whether the Bank, through Diaz's conduct, was a cause ("a contributing factor") of third parties' substantial interference with appellants' possession of the garage unit and the Bank, and those acting on its behalf, thereby became responsible for promptly taking remedial action.[13] (See Rest.2d Prop., § 6.1, coms. c & e, pp. 225, 227;

_____

[12] Appellants showed good cause for their late filing of the declaration and respondents did not object to its filing.

[13] Appellants' suggestion that the Bank could have protected them by self-help means, such as by changing the locks, while post-foreclosure occupants were living there is not well taken. (See *Spinks v. Equity Residential Briarwood Apts.*, *supra*, 171 Cal.App.4th 1004, 1037-1039; see also *Jordan v. Talbot* (1961) 55 Cal.2d 597, 605 ["Regardless of who has the right to possession, orderly procedure and preservation of

58

see also Code Civ. Proc., § 1161a, subd. (b); Stats. 2008, ch. 69, § 6, p. 179 [former § 1161b]; *Bank of America, N.A. v. Owens* (2010) 903 N.Y.S.2d 667, 672 ["if a successor property owner has credible evidence that a resident of foreclosed property is not a bona fide tenant, the successor owner is free to bring an eviction proceeding against the resident without providing the ninety days advance notice mandated by the PTFA"]).

As to the November 2009 letter from the Bank's attorney, the Bank's legal position was ostensibly predicated on the fact that the notice of default had been recorded before appellants entered into their most recent lease.[14]  Where a landlord does not physically interfere with tenants' possession and merely wrongfully serves a notice to quit, tenants can recover damages for a wrongful eviction only if the landlord acted with malice.  (See *Asell v. Rodrigues* (1973) 32 Cal.App.3d 817, 825.)  The mere threat to resort to legal process, made in good faith, "cannot amount to a constructive eviction."  (*Lindenberg v. MacDonald* (1950) 34 Cal.2d 678, 683-684.)  A "landlord is not liable for a breach of the implied covenant [of quiet enjoyment] or a constructive eviction when he wrongfully commences an eviction proceeding in good faith, even though the tenant vacates the premises in response to the wrongful notice to quit."  (7 Miller & Starr, Cal. Real Estate (3d ed.) § 19:159, p. 504, fn. omitted.)

Beyond the Bank's letter threatening an unlawful detainer action, however, there was evidence from which a reasonable trier of fact could find that the third-party conduct preventing appellant Nativi's return to the garage unit in October 2009 was attributable to Diaz and ultimately to the Bank.  The evidence indicated that, with respect to the Stoneylake property, Advisors was responsible for informing the property's occupants of

_____

the peace require that the actual possession shall not be disturbed except by legal process"].)

[14]     We recognize that the Bank's letter predated Congress's amendment of the PTFA to define "the date of a notice of foreclosure" as the date title passes to the successor in interest in the foreclosed property.  (See Pub.L. 111-203, Title XIV, § 1484, subd. (1).)

the foreclosure, facilitating their relocation if possible, and preparing the property for resale. The evidence does not show that Advisors took steps to determine whether appellants had the right to remain as tenants of the garage unit through the end of their lease term by operation of the PTFA. In light of all the evidence, we conclude that a triable issue of material fact exists whether the Bank's letter was issued in good faith or whether it was part of a larger course of conduct amounting to constructive eviction by the Bank.[15]

IV

*Protective Order*

A. *Parties' Contentions*

Appellants complain that, after the trial court had already ordered AHMSI to produce documents, AHMSI brought a motion for a protective order and the trial court improperly granted it. They assert that AHMSI failed to move promptly for such order or present good cause for its issuance. Appellants maintain that the documents "would be of acute interest to the general public" because they set forth the servicer's "policies and procedures for the disposition of property owned by the banks" and the "public has a keen interest in the ongoing mortgage crisis and how banks are dealing with the properties they foreclose on and the tenants who live there." Appellants state that "[t]he

---

[15] In their reply brief, appellants belatedly assert that the grant of summary judgment was not appropriate because they may be entitled to prospective injunctive relief under Code of Civil Procedure section 1161b. They have not shown they were seeking such relief based on that section, the section affords them any prospective rights since their lease term expired years ago, or the law applies retroactively. (See Code Civ. Proc., § 3 ["No part of [the Code of Civil Procedure] is retroactive, unless expressly so declared"]; *Elsner v. Uveges, supra,* 34 Cal.4th 915, 936 ["New statutes are presumed to operate only prospectively absent some clear indication that the Legislature intended otherwise. [Citations.]"].)

issue is whether the public should have a right to that information as well." They urge us to vacate the protective order for all the foregoing reasons.

Respondents counter that the trial court properly granted their motion for a protective order because there was "no good faith basis for appellants to disseminate respondent AHMSI's proprietary data outside the confines of this lawsuit."

B. *Procedural History*

On April 13, 2011, appellants served respondents by mail with their notice of deposition of AHMSI's person most qualified to testify (PMQ) and requested the production of the documents, including AHMSI's policies, procedures, and practices concerning marketing and selling, servicing, or contracting with third parties to manage lender-owned California real estate, effective between January 1, 2009 to present, at the deposition. AHMSI objected to the request for production of those policies, procedures, and practices on multiple grounds, including on the basis that appellants' request "seeks confidential proprietary information protected from disclosure by California's right to privacy . . . ."[16] In a letter dated June 6, 2011, AHMSI's counsel again indicated that the company's policies and practices were proprietary information.

---

[16] California Constitution, article I, section 1, states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy*." (Italics added.) Several appellate courts have concluded that this constitutional provision does not apply to corporations. (See e.g. *Ameri-Medical Corp. v. Workers' Comp. Appeals Bd.* (1996) 42 Cal.App.4th 1260, 1287-1288; *Roberts v. Gulf Oil Corp.* (1983) 147 Cal.App.3d 770, 791.) This court has recognized: " 'The extent of any privacy rights of a business entity is unsettled.' (*Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1492, fn. 9 . . . ; compare *Roberts v. Gulf Oil Corp.* (1983) 147 Cal.App.3d 770, 793 . . . [state Constitution protects the privacy rights of people, not corporations] and *Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1504-1505 . . . [following *Roberts* and declining to address federal constitutional privacy right] with *H & M Associates v. City of El Centro* (1980) 109 Cal.App.3d 399, 410 . . . ['businesses, regardless of their legal form, have zones of privacy which may not be legitimately

On June 14, 2011, appellants took the deposition of AHMSI's PMQ and AHMSI's counsel objected to questions on the ground of confidential proprietary information. The deponent did not have the requested documents.

By noticed motion filed on June 29, 2011, appellants moved to compel further responses to requests for admissions, further responses to deposition questions, and production of documents.

On July 22, 2011, the trial court granted in part appellants' motion to compel further discovery. It ordered AHMSI's PMQ to appear for further deposition, answer certain deposition questions, and produce documents in response to three of appellants' requests concerning AHMSI's policies, procedures, and practices regarding marketing and selling, servicing, and contracting with third parties to manage real estate owned by lenders. It ordered such discovery to take place within 20 calendar days.

AHMSI received the order, which had been served by mail, on July 25, 2011. In an email dated Friday August 5, 2011, appellants' counsel indicated that appellants would not stipulate to a protective order. The parties agreed that the deposition of AMHSI's PMQ would take place on August 16, 2011.

On August 12, 2011, respondents filed an ex parte application for an order shortening time for notice on a motion for a protective order. In support of the

invaded']; see also *Connecticut Indem. Co. v. Superior Court* (2000) 23 Cal.4th 807, 817 . . . [assuming without deciding that insured corporations have constitutional and statutory privacy rights]; *Hecht, Solberg, Robinson, Goldberg & Bagley v. Superior Court* (2006) 137 Cal.App.4th 579, 593-594 . . . [same as applied to partnerships].)" (*S.B.C.C., Inc. v. St. Paul Fire & Marine Ins. Co.* (2010) 186 Cal.App.4th 383, 396, fn. 6.) The California Supreme Court has described two categories of privacy interests: "Legally recognized privacy interests are generally of two classes: (1) interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy'); and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference ('autonomy privacy')." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35.)

application, respondents filed their counsel's declaration, which stated in part: "There is absolutely **no prejudice to Plaintiffs** whatsoever in keeping these documents from dissemination outside of this lawsuit, yet AHMSI is severely prejudiced if these documents are not provided any protection at all."  No factual basis or articulated reasoning was given for this assertion.  The declaration did not even affirmatively assert that the documents constituted or contained confidential commercial or private information.

With their application, respondents submitted a sweeping proposed order that provided procedures for designating material as confidential and challenging confidentiality designations, extensive restrictions regarding the use of designated materials in discovery and in court, and provisions for the return and destruction of materials received at the conclusion of the litigation.[17]  The proposed order broadly stated:  "All Confidential Information produced or exchanged in the course of this case (not including information that is publicly available) shall be used by the Party or Parties to whom the information is produced solely for the purpose of this case."

The parties stipulated that the documents produced at the August 16, 2011 deposition would be conditionally protected as confidential pending the court's ruling on AHMSI's motion for a protective order.

---

[17]  The proposed order allowed any party or non-party to designate a document or response to discovery as "confidential information," it limited the persons to whom such information could be disclosed, it required all documents containing confidential information to be filed sealed and stamped confidential, it required a party disagreeing with a designation to give written notice to the designator, and it gave the designator 30 days to apply for a court order designating the material as confidential.  The proposed order stated that its provisions restricting communication or use of confidential information "continue[d] to be binding after the conclusion of the action, unless otherwise agreed or ordered."

A notice of motion for a protective order was filed on August 26, 2011. The parties agreed that the ex parte application would be deemed the moving papers.

Appellants opposed the motion on the grounds that it was untimely and AHMSI had not shown that the documents should be protected. They pointed out that the motion was not accompanied by a declaration from any AMHSI employee attesting that the documents were confidential and proprietary and that AHMSI would be harmed by their disclosure. Appellants argued that it was "imperative that the public have access to information concerning the management and eviction practices of servicers such as AHMSI."

On September 23, 2011, the trial court granted AHMSI's request for a protective order. The court found there had "been a showing that the information is proprietary in nature." The formal order, filed November 15, 2011, adopted the proposed comprehensive protective order.

C. *Analysis*

"Before, during, or after a deposition, any party, any deponent, or any other affected natural person or organization may promptly move for a protective order."[18] (Code Civ. Proc., § 2025.420, subd. (a); cf. Code Civ. Proc., § 2031.060, subd. (a).) The motion must be accompanied by a meet and confer declaration under Code of Civil Procedure section 2016.040.[19] (*Ibid*.) "The court, for good cause shown, may make any order that justice requires to protect any party, deponent, or other natural person or

---

[18] In their argument, appellants direct us to Code Civil Procedure section 2031.060, subdivision (a), which concerns discovery demands for "inspection, copying, testing, or sampling of documents, tangible things, places, or electronically stored information . . . ." The discovery provisions regarding production of documents by a deponent generally parallel this section.

[19] "A meet and confer declaration in support of a motion shall state facts showing a reasonable and good faith attempt at an informal resolution of each issue presented by the motion." (Code Civ. Proc., § 2016.040.)

organization from unwarranted annoyance, embarrassment, or oppression, or undue burden and expense."  (Code Civ. Proc., § 2025.420, subd. (b); cf. Code Civ. Proc., § 2031.060, subd. (b).)

Code of Civil Procedure section 2025.420, subdivision (b), provides a *nonexclusive* list of permissible directions that may be included in a protective order. (Cf. Code Civ. Proc., § 2031.060, subd. (b).)  A protective order may include the direction that "a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only to specified persons or only in a specified way."  (Code Civ. Proc., § 2025.420, subd. (b)(13), cf. Code Civ. Proc., § 2031.060, subd. (b)(5).)

"[T]he issuance and formulation of protective orders are to a large extent discretionary.  (See *Coalition Against Police Abuse v. Superior Court* (1985) 170 Cal.App.3d 888, 904 . . . .)"  (*Raymond Handling Concepts Corp. v. Superior Court* (1995) 39 Cal.App.4th 584, 588.)  Ruling on motions for protective orders will not be disturbed absent an abuse of discretion.  (See *Moskowitz v. Superior Court* (1982) 137 Cal.App.3d 313, 317.)

First, as to the timeliness of the motion for a protective order, the promptness of the request turns on the facts.  Appellants' motion for a protective order was not untimely as a matter of law because it was made after the order compelling further deposition and production, especially since it was contesting the dissemination of the documents, not their production.  (See Code Civ. Proc., § 2025.420, subd. (a); cf. *Stadish v. Superior Court* (1999) 71 Cal.App.4th 1130, 1144 ["upon a proper showing a party may—even after it has waived its right to object to the production of documents, and has produced most of the documents requested—seek a protective order restricting dissemination of the documents" under former Code Civil Procedure, section 2031, subdivision (e)].)  Here, within a week of learning that appellants would not agree to a protective order and before

the date agreed upon by the parties for the court-ordered deposition and the deponent's production of documents, AHMSI applied for an order shortening time for notice of a motion for a protective order. It then promptly filed its motion. Appellants have not shown that the court abused its discretion by considering the motion on its merits.

The propriety of the protective order is a different issue. "The state has two substantial interests in regulating pretrial discovery. The first is to facilitate the search for truth and promote justice. The second is to protect the legitimate privacy interests of the litigants and third parties. [Citation.] 'The interest in truth and justice is promoted by allowing liberal discovery of information in the possession of the opposing party. [Citation.] The interest in privacy is promoted by restricting the procurement or dissemination of information from the opposing party upon a showing of "good cause." [Citations.]' [Citation.] The trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery. [Citation.]" (*Stadish v. Superior Court*, *supra*, 71 Cal.App.4th at p. 1145.) A trial court must balance the various interests in deciding "whether dissemination of the documents should be restricted." (*Id.* at p. 1146.) Further, even where a motion for a protective order is denied in whole or part, the trial court may still impose "terms and conditions that are just." (Code Civ. Proc., § 2025.420, subd. (g); see Code Civ. Proc., § 2031.060, subd. (g) [same].)

"Parties to civil litigation, recognizing the broad policies favoring discovery, often choose to avoid costly and time-consuming motion practice by entering into stipulations for protective orders that permit production but limit disclosure and use of discovered information deemed by the producing party to contain confidential, proprietary, and/or private information. They thereby defer or obviate the need for specific court determination as to the propriety of designating materials confidential unless and until that designation is challenged. [Citations.]" (*Mercury Interactive Corp. v. Klein* (2007)

158 Cal.App.4th 60, 98-99.)  In this case, however, the parties were not able to reach an agreement.

Where a party must resort to the courts, "the burden is on the party seeking the protective order to show good cause for whatever order is sought.  [Citation.]"  (*Fairmont Ins. Co. v. Superior Court* (2000) 22 Cal.4th 245, 255.)  Even assuming California trial courts may in appropriate circumstances issue an umbrella protective order that allows the parties to designate as confidential documents produced in discovery (but see *Stadish v. Superior Court*, *supra*, 71 Cal.App.4th at p. 1144 [trial court impermissibly "delegated to the parties the responsibility of determining which items of discovery contained trade secrets"]) and specifies the permissible use of those designated documents, the declaration submitted in support of AMHSI's motion for such a protective order was entirely conclusory and lacked any factual specificity.  (See *People v. Superior Court* (1967) 248 Cal.App.2d 276, 281-282 [declaration containing mere conclusions insufficient to establish good cause]; cf. *In re Roman Catholic Archbishop of Portland in Oregon* (9th Cir. 2011) 661 F.3d 417, 424 [" '[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test.' [Citations.]"]; cf. also Fed. Rules of Court, rule 26(c) [". . . The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: . . . [¶] (G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way . . . ."].)  AHMSI made no factual showing that (1) the documents that it had been ordered to produce contained confidential commercial information or information in which it had any protectable interest or (2) dissemination of the documents to the public would result in injury.

In addition, the proposed order, which the court adopted in its entirety, went far beyond restricting disclosure of those documents in advance of trial. (See *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1209; fn. 25 ["Numerous reviewing courts . . . have found a First Amendment right of access to civil litigation documents filed in court as a basis for adjudication. [Citations.] By contrast, decisions have held that the First Amendment does not compel public access to discovery materials that are neither used at trial nor submitted as a basis for adjudication. [Citations.]"]; *Seattle Times Co. v. Rhinehart* (1984) 467 U.S. 20, 33 [104 S.Ct. 2199] ["restraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information"]; see also Cal. Rules of Court, rule 2.550(d) [court may not order record to be filed under seal if an overriding interest does not overcome the right of public access to the record].) Good cause was not shown for issuance of the sweeping protective order and we find that its issuance was an abuse of discretion.

DISPOSITION

The judgment and the trial court's order granting respondent AHMSI's motion for a protective order is reversed. Appellants are entitled to costs on appeal.

_____
ELIA, J.

WE CONCUR:

_____
RUSHING, P. J.

_____
PREMO, J.

68

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court |
| Trial Judge: | Hon. William J. Monahan,<br>Hon. Carrie Zepeda |
| Attorneys for Appellants: | Madeline Howard and<br>Robert P. Capistrano |
| | S. Lynn Martinez,<br>Richard A. Rothschild and<br>Robert D. Newman |
| | M. Julie Patino |
| | Alborg, Veiluva & Martin and<br>Michael J. Veiluva |
| | Jenner & Block,<br>Andrew J. Thomas and<br>Kate T. Spelman |
| Attorneys for amicus curiae<br> in support of Appellants: | Kent Qian<br>Barbara A. Jones |
| Attorneys for Respondents: | Wright, Finlay & Zak,<br>T. Robert Finlay,<br>Charles C. McKenna and<br>Peter M. Watson |
| Attorneys for amicus curiae<br> in support of Respondents: | Noonan & Lieberman,<br>Janes V. Noonan,<br>Ruth B. Sosniak,<br>Michael H. Walsh and<br>Cody J. Cocanig |
| | Simmonds & Narita and<br>Tomio B. Narita |